00001

```
 1              Vol. I, Pgs. 1-168
 2              Exhibits 1-2
 3      UNITED STATES DISTRICT COURT
 4        DISTRICT OF MASSACHUSETTS
 5  - - - - - - - - - - - - - - - - - -
 6  THOMAS W. TREFNY
 7          Plaintiff
 8  v.              CA No. 04-10798-NG
 9  HYANNIS HARBOR TOURS, INC.
10          Defendant
11  - - - - - - - - - - - - - - - - - -
12
13       DEPOSITION of THOMAS W. TREFNY
14     Monday, December 13, 2004 - 10:48 a.m.
15        CETRULO & CAPONE LLP
16          Two Seaport Lane
17         Boston, Massachusetts
18
19   - - - - - Jill K. Ruggieri, RMR/CRR - - - - -
20        Farmer Arsenault Brock LLC
21       50 Congress Street, Suite 415
22        Boston, Massachusetts 02109
23            617.728.4404
24
```

00002
1   APPEARANCES:
2
3   Latti & Anderson LLP
4        David E. Anderson, Esq.
5        30-31 Union Wharf
6        Boston, Massachusetts 02109
7        (617) 523-1000  Fax:  (617) 523-7394
8        on behalf of the Plaintiff
9
10  Cetrulo & Capone LLP
11       Michael J. Rauworth, Esq.
12       Two Seaport Lane
13       Boston, Massachusetts 02210
14       (617) 217-5500  Fax:  (617) 217-5200
15       on behalf of the Defendant
16
17
18
19
20
21
22
23
24

00003

1               P R O C E E D I N G S

2               THOMAS W. TREFNY, a witness having

3   been duly sworn, on oath deposes and says as

4   follows:

5                     EXAMINATION

6   BY MR. RAUWORTH:

7     Q    Good morning, Mr. Trefny.

8     A    Good morning.

9     Q    Let's get some identification on the

10  record, just so we're -- so we've got that behind

11  us.

12           You are the Thomas W. Trefny that's

13  named in the complaint in this case?

14    A    Yes.

15    Q    Okay.

16           And what's your current residential

17  address?

18    A    4446A Falmouth Road, Cotuit, Mass.

19    Q    C-O-T-U-I-T?

20    A    Yes.

21    Q    What's that zip?

22    A    02635.

23    Q    We will just go over some of the

24  procedures to make this simple for everybody.

00004

1       The output of what we do today comes

2  through the transcript that our reporter is

3  preparing.

4       So to make that be accurate and to

5  save ourselves headaches and repeating, you and I

6  need to work together to try to avoid speaking at

7  the same time, because she can only get one voice

8  at a time.

9       Likewise, if there's an interruption

10  or if Dave Anderson has something to say, each of

11  us needs to stop for the same reason.

12       We'll need to ask you to kind of

13  focus on keeping your voice up and focused in the

14  direction of the reporter so that she doesn't have

15  any difficulty in catching the right word and

16  getting it transcribed.

17       If at any point you feel that you're

18  not comfortable that you've heard a question to

19  your satisfaction or understood it to your

20  satisfaction, then we just need you to let us know,

21  and we'll take steps accordingly.

22       But if you do go ahead and answer,

23  we're going to have to proceed on the assumption

24  that you're content that you've heard it and

00005

1   understood it to your own satisfaction.

2          Is that fair?

3   A   Yes.

4   Q   Great.

5          Have you been through the process of

6   having your deposition taken before?

7   A   I was interviewed by Frank Sweeney over

8   the phone, and it was recorded.

9   Q   Okay.

10          But I mean apart from this particular

11   case, have you ever a circumstance in any kind of a

12   proceeding where your deposition was taken?

13   A   No.

14   Q   Nobody else's case or any other

15   proceeding anywhere?

16   A   Not that I'm aware of.

17   Q   You don't recall being with someone who

18   had a court stenographic machine taking down what

19   you said?

20   A   Perhaps during my divorce proceedings.

21   That would be the only other time.

22   Q   Okay.

23          And that may have been but you're not

24   sure?

00006

1    A   Correct.

2    Q   Have you ever had occasion to give any

3  testimony in an actual court where a judge was

4  presiding?

5    A  No.

6    Q   How about in something like an

7  arbitration proceeding?

8    A  No.

9    Q   Okay.

10      So no other formal testimony that you

11  can think of other than the possibility of that

12  deposition in the divorce proceedings?

13    A  No.

14    Q   Okay, great.

15      Is there any kind of physical

16  condition that you feel that you have today, a cold

17  or anything else that you feel gets in your way of

18  your ability to hear or understand?

19    A  No.

20    Q   How about any medication that you're

21  taking?

22      Is there any of that, if you're

23  taking any medication at all, is there any of it

24  that you feel gets in the way of your ability to

00007

1  hear and understand?

2    A   No.

3    Q   Okay, good.

4         Let me get an understanding of how

5  you assess your own medical condition today as it

6  relates to your right knee as we come together at

7  the end of 2004.

8    A   To date, I have no complaints regarding

9  the right knee.

10   Q   Okay.

11        Now, recently Mr. Anderson provided

12  me with some paperwork that went back to, I

13  believe, early 2003 that you submitted to the Navy

14  in order to straighten out your medical status with

15  them.  Looked like a submission that was asking to

16  be reinstated to a normal medical situation.

17        You recall what I'm talking about?

18   A   That's correct, yes.

19   Q   I think it was January of 2003; does that

20  sound right?

21   A   Yes, sir.

22   Q   Okay.

23        And then from that time up until now,

24  have you experienced any difficulties associated

00008

1   with your right knee?

2      A   No serious difficulties.

3      Q   I'm sorry?

4      A   No serious difficulties.

5      Q   Okay.

6           Any difficulties at all?

7      A   Just some discomfort at times, but

8   otherwise, it's fully functional, stable and

9   strong.

10     Q   Okay.

11          And when you say discomfort, this

12   would be, for example, if you were on a long

13   airline flight, if you're sort of in a confined

14   situation, is that the kind of discomfort you mean?

15     A   No, discomfort would be exercising for

16   prolonged periods of time.

17          But generally, no complaints.

18     Q   Okay.

19          And what kind of -- how would you

20   describe the nature of your exercise routines as

21   they stand now?  What do you do by way of exercise?

22     A   I hike, work out, strength training.  If

23   I do all that on a continuing basis, everything is

24   good.

00009

1           I generally have no problems with the

2   knee.

3     Q   Okay.

4           So there's hiking, you mentioned

5   strength training.

6           What did you say after that?  I'm

7   sorry.  Work out with weights, did you say?

8     A   That's part of the weight training or

9   strength training.

10    Q   Okay.

11          Is that at an organized gym where

12  they have machines?

13    A   Yes, sir.  All the exercise I've done

14  during physical therapy to keep the leg strong.

15    Q   Okay.

16          So the strength training would

17  involve exercises on a particular machine that's

18  designed to flex the knee and give the associated

19  muscles strength?

20    A   Correct.

21    Q   Okay.

22          And then you've been doing that since

23  the -- since that point in early January or even

24  somewhat before?

00010

1    A   During physical therapy, recovering from

2  the surgery, the therapist showed me some exercises

3  I can do to maintain strength in the leg and build

4  strength, and I've continued with that as best as I

5  could, given the conditions.

6    Q   Okay.

7    A   Whether it be work or otherwise.

8    Q   Right.

9       And before the incident on the GREY

10  LADY, what did you do by way of exercise?

11    A   I was still very active.  I still hiked,

12  cardio, strength training.

13    Q   And part of -- go ahead?

14    A   So I was very active before and after the

15  accident.

16    Q   So cardio would include things like

17  fairly long distance running?

18    A   Short distance running, bicycling,

19  walking, hiking.

20    Q   Okay.

21       Things that boost your heart rate?

22  A   Yes, sir.

23  Q   Right, okay.

24       So your level of activity and your

00011

1  ability to do those kind of things is basically the

2  same today as it was before the accident?

3      A   That would be fair to say, yes.

4      Q   Okay.

5          Is there anything you can think of

6  that you're not able to do today that you did

7  beforehand?

8      A   I am more cautious in what I do.  I --

9  excuse me.  More cautious in what I do.  I don't do

10  anything that I would think would cause any

11  difficulty with the knee.

12         I limit contact sports and things of

13  that nature.

14      Q   Okay.

15         And before the incident, what did you

16  do by way of things that included contact sports?

17      A   Not much since school.  Just strive to be

18  healthy and not to get hurt.  So as long as I kept

19  exercising smartly...

20      Q   Okay.

21         But before you started to work for

22  the GREY LADY, had you been involved in, for

23  example, any kind of teams that involved contact,

24  for example, did you play rugby?

00012

1    A    No, I did not.

2    Q    Okay.

3         Soccer?

4    A    No.

5    Q    Okay.  All right.

6    A    No organized sports.

7    Q    All right.

8         Now, in the time from the incident in

9    July of 2002 up until that point in January where

10   you sent the letter to the Navy asking to be

11   physically reinstated, can you describe for me

12   what --

13        Well, right after the incident, how

14   did you find your activities altered, things that

15   you were able to do?

16   A    Since the accident, I had virtually no

17   stability within the knee.  The -- the ligament was

18   found to be torn, as well as the meniscus.

19   Therefore, the joint was very weak and unstable.

20        So my activity -- I could not

21   continue in my present employment, nor my live work

22   in the maritime field until such time that I had

23   surgery done to correct it.

24   Q    Okay.

00013

1          Well, my focus is really on what you

2    personally experienced, putting aside for a moment

3    the medical opinion.

4          In other words, after you -- well,

5    let's say -- take from the time of the incident

6    until the time of the surgery, which was like early

7    October of 2002, is that about right?

8      A   Yes.

9      Q   Okay.

10          What were you unable to do that you

11    were doing before?

12          You mentioned going to work, and I

13    understand that.

14      A   I was not working.  I was not exercising,

15    other than what was prescribed by the doctor and

16    the therapist.  My physical activity was

17    practically nil.

18          I was wearing a brace that was given

19    to me by the hospital.  And -- but up until the

20    time of the surgery, I was working at keeping the

21    muscles strong to support the joint, but I could

22    not take part in any work or physical activity.

23      Q   Okay.

24          So they had you -- the medical

00014

1  providers that you saw had you doing an exercise

2  regime leading up to the time of the surgery in

3  early October; do I understand that correctly?

4     A   Yes, as I -- as I recall.

5     Q   Okay.

6         So when you weren't doing the

7  exercises that they had provided, what did you do

8  with the rest of your time?

9     A   Nothing.  Just sitting around the house,

10  doing some light house work, but nothing that would

11  aggravate the condition any further.

12    Q   Okay.

13        Was -- did they provide -- did they

14  tell you a reason why the surgery was scheduled at

15  that particular time?

16        Sounds like it was a little bit over

17  two months after the incident.

18    A   There was a period in which -- there was

19  evaluations done by the doctor, and each subsequent

20  evaluation led him to believe there was a torn ACL

21  and meniscus, which was confirmed by the MRI that

22  was done.

23        And then there was some scheduling

24  conflict between the doctor's office and the

00015

1   hospital and that of the insurance company

2   authorizing the surgery.

3       Q   Okay.

4           And from when to when were you using

5   crutches?

6       A   From the time of the accident after my

7   visit to the hospital at a time in which

8   Dr. McWilliam said that -- to limit the use.  And I

9   was back on the crutches again after the surgery

10  for a period of approximately two weeks.

11      Q   Okay.

12          So sometime after the end of July but

13  before the beginning of October, Dr. McWilliam told

14  you you ought not to be using the crutches for a

15  period of time before the surgery?

16      A   As I recall, that is correct.

17      Q   Okay.

18          Did he give you to understand the

19  purpose of that direction to you?

20      A   As I recall, it was to maintain the

21  muscle mass within the leg.  Continue to exercise

22  it and not to rely on the crutches unless I needed

23  them for stability.

24      Q   Okay.

00016

1          And leading up to the surgery, I

2    assume part of what the providers wanted you to do

3    included some of the kinds of exercises that you

4    currently do today, strength exercises related to

5    the knee?

6      A   To a point that I did not aggravate the

7    injury any further.

8      Q   Okay.

9          And this involved going to a gym and

10   using a machine, I assume?

11     A   At the time, no.  I was not going to an

12   organized gym.  I was doing some exercises in my

13   home, as prescribed by the doctor, using a

14   resistance band --

15     Q   Resistance band, like a rubber band?

16     A   Yes.

17     Q   Okay.

18          Something that would require you to

19   exert a little more muscular strength in order to

20   extend your leg sort of thing?

21     A   Yes.

22     Q   Okay.

23          I'm sorry, I may have interrupted you

24   there.  Was there something else you were going to

00017

1  say before I --

2    A   No.

3    Q   Okay.

4        After the incident but before the

5  surgery, you were driving?

6    A   Yes.

7    Q   And after the incident, approximately how

8  long were you on the crutches?

9    A   Approximately two weeks, give or take.

10    Q   So about two weeks after the incident and

11  about two weeks after the surgery for crutches?

12    A   I believe that to be correct.

13    Q   Okay.

14        And then after the -- after you came

15  off the crutches after the surgery, sounds like

16  this would have been roughly mid October of 2002?

17    A   Yes.

18    Q   Okay.

19        What -- what did you spend your time

20  doing up until that point in January that you asked

21  to be reinstated?

22    A   I was attending physical therapy, as

23  prescribed by the doctor, under the care of a

24  licensed physical therapist, doing exercises at

00018

1   that session and also exercises at home, as

2   prescribed by the therapist.

3       Q    Okay.

4              Anything else?

5       A    Some light walking, as I can tolerate,

6   slowly building up to -- slowly working my way up,

7   increasing the strength and endurance and building

8   muscle mass to support the joint.

9       Q    Okay.

10      A    All of which is to get me to the recovery

11  point.

12      Q    Okay.

13             Now, let's get an understanding of

14  the -- of what has gone on with your work activity

15  in the meantime.

16             Are you currently working?

17      A    In a matter of speaking, yes.

18             I am on active duty with the Navy.

19  And -- until the 18th of this month, which I'll be

20  released from active duty.

21      Q    So this is a status in which you're on

22  leave, you're free to do other things, but you're

23  still in a situation that you would be paid for the

24  leave time, through the 18th?

00019

1    A    Right.  Yes, sir.

2    Q    Okay.

3         And what are your expectations as far

4    as what's next?

5    A    Return to my previous civilian job and

6    currently seeking other employment, just --

7         I intend to get in touch with my

8    employer that I worked for just prior to my

9    mobilization in December of '03, but I'm also

10   looking for other work as well.

11   Q    Okay.


12        Now, let me go back and make sure I

13   understand it.

14        Up until -- well, you recently came

15   back into the country from being overseas, correct?

16   A    Yes, sir.

17   Q    And you came back into the country

18   roughly when?

19   A    November 15th.

20   Q    Okay.

21        And so you where were you from then

22   until the time you came back into Massachusetts?

23   A    From January to November, I was in Kuwait

24   serving with the US Navy.

00020

1   Q  Okay.

2      You came back into the States

3  mid-November but not directly back into

4  Massachusetts?

5   A  I was in Massachusetts, and I made some

6  trips to Maine, western Mass., visit family and

7  friends.

8   Q  All right.

9      So were you -- when you came back to

10  Massachusetts -- you came back from overseas in the

11  middle of November, have you been on terminal leave

12  since then?

13   A  That's correct.

14   Q  Okay.

15      And once you came back to the States

16  from Kuwait, at that point, you stopped having

17  assignments for the military?

18      You were basically free to go about

19  your other duties?

20   A  I departed Kuwait November 15th and in

21  transit, I arrived in Massachusetts and began to

22  process out of New London, at which time I was put

23  on terminal leave until December 18th, which is my

24  last day of service.

00021

1    Q    Okay.

2         You began this period of active duty

3    in January of '04?

4    A    I was mobilized to active duty December

5    31, '03 and I was -- reported for duty in Kuwait

6    January 17th.

7    Q    Now, when you say you were mobilized,

8    does that mean on December 31st of 2003, your last

9    New Year's Eve, you were required to show up at a

10   military facility in uniform or did you simply get

11   orders to do something at a later time?

12   A    I received verbal orders December 31st to

13   proceed to Quincy Reserve Center on January 6th for

14   the mobilization process.

15        Once that was complete, I was sent to

16   Groton subbase for further processing on

17   January 7th.

18        From the 7th to approximately the

19   17th, I was waiting in transit for travel to

20   Kuwait.

21   Q    Okay.

22        Prior to the mobilization, what are

23   you last been doing by way of employment?

24   A    The last employment prior to mobilization

00022

1   was with Wackenhut Nuclear Services providing

2   security at Pilgrim Nuclear Power Plant.

3       Q    Down along the Cape Cod Canal, correct?

4       A    No, sir, Plymouth, Massachusetts.

5       Q    Okay.

6            You did that from when to when?

7       A    From March 2003 to May 2003, I was a

8   temporary employee.

9            From late July/early August, I was

10  hired once again as a full-time employee.

11      Q    And so from July 2003 to December, you

12  were steady with Wackenhut?

13      A    Yes.

14           MR. ANDERSON:  If that's the case, I

15  did the wage loss calculation incorrectly.  I

16  included -- I actually deducted -- during the

17  calculation, I deducted wages earned by Wackenhut

18  from September of '03 through December of '03.  I

19  deducted them from the gross amount lost, such that

20  I got -- knocked off 20 as what he earned during

21  that time period for essentially the year and two

22  months following the accident and probably should

23  have knocked off 10, something like that, not that

24  it's a big deal.

00023

1            MR. RAUWORTH:  I'm losing you a

2    little bit.

3            MR. ANDERSON:  Just -- I just

4    realized it now, when I calculated --

5            I knew he worked at Wackenhut --

6            MR. RAUWORTH:  Right.

7            MR. ANDERSON:  -- during the spring

8    of '03.

9            The wage loss claim is that as a

10   result of this injury, that he lost a month of work

11   on the GREY LADY; he lost four months at Maersk in

12   the, you know, fall, essentially, of '02.  And then

13   he would have been activated with his unit in

14   January or February of '03 and would have, you

15   know, worked for seven or eight months with his

16   unit, his Naval unit.

17           Instead, he didn't work that last

18   month at -- for the GREY LADY.  He did not take a

19   trip from Maersk and he did work with his unit in

20   the spring/summer of '03.

21           He did, however, work at Wackenhut,

22   so you take what he lost from those employers, then

23   you subtract that Wackenhut.

24           When I subtracted that Wackenhut, I

00024

1  subtracted that Wackenhut for a longer period of

2  time than I should have.

3        MR. RAUWORTH:  It's a dollar amount,

4  whatever it is.

5        MR. ANDERSON:  No, because the time

6  period in which we're claiming that his wage loss

7  stopped was in September of '03.

8        MR. RAUWORTH:  Oh, oh, oh, oh.

9        MR. ANDERSON:  And he actually worked

10  for them from, you know, March of '03 through

11  December of '03, so it was a longer period of time.

12        I thought he only worked from the

13  spring but he actually worked the whole year.

14        MR. RAUWORTH:  Okay.

15        MR. ANDERSON:  So it's not a big

16  deal, because the earnings weren't that big, but --

17  BY MR. RAUWORTH:

18    Q   Now, it sounds as if there was a time

19  from somewhere in May 2003, Mr. Trefny, to July of

20  2003 where there was a break with Wackenhut?

21    A   That's correct.

22    Q   Okay.

23        That was for approximately how long?

24    A   From May until July.

00025

1     Q    So did you stop working with them the

2   beginning or end of May of 2003?

3     A    As I recall, it was the end of Maersk,

4   towards the end of May.

5     Q    Okay.

6          So you didn't work for Wackenhut at

7   all in June.  You worked for Wackenhut most of May,

8   if I understand it correctly?

9     A    I believe that to be correct, yes, sir.

10    Q    Okay.

11         And then you started up again

12   beginning or end of July 2003?

13    A    It was late July.

14    Q    Okay.

15         So an approximation, two months, all

16   of June, rest of July?

17    A    That's fair.

18    Q    Okay.  I'm sure the record will somehow

19   reflect that.

20         And Wackenhut was the first work that

21   you took on after your work on the GREY LADY; is

22   that correct?

23    A    Yes.

24    Q    Okay.

00026

1          Now, let me understand a little bit

2    about how the Kuwait situation was affected by what

3    went on on the GREY LADY.

4          First of all, the work that you were

5    doing when you were mobilized in Kuwait during this

6    past -- most of this past calendar year, it was

7    what kind of work?

8      A    My job was port operations officer for

9    military sealift command.  We were coordinating

10   movement of US and allied shipping in support of

11   the war effort in the Port of Kuwait and the

12   Persian Gulf.

13     Q    Okay.

14          The -- that's the principal Port of

15   Kuwait, right?

16     A    Yes.

17     Q    Okay.

18          And those were your duties throughout

19   the time that you were there?

20     A    Yes.

21     Q    You were promoted the beginning of this

22   year?

23     A    January 1st, 2004, I was promoted to

24   lieutenant commander.

00027

1    Q    Okay.

2         And as a port operations officer --

3    Well, let me back up.

4         You've sailed on other kinds of

5    civilian merchant ships in the past since you came

6    out of the academy, correct?

7    A    Yes.

8    Q    And you've become familiar with the

9    activities of a ship's agent when a ship comes into

10   an overseas port or US port, right?

11   A    Yes.

12   Q    How did the activities of a port

13   operations officer for an MSC unit like you were in

14   compared to what a civilian ship's agent does for a

15   ship?

16   A    It's similar but not -- it is similar.

17   We -- we were not providing many of the husbanding

18   items that a civilian shipping agent were

19   providing.

20        We were coordinating movement of

21   ships, providing any support to the ships as we

22   could.

23        But more or less it was as I stated,

24   coordinating the movement both in and out of the

00028

 1  port and the Gulf, as well as the -- assisting in

 2  the offloading of the vessel with other units in

 3  the port.

 4    Q   Okay.

 5        So, for example, your office would

 6  determine which ship went to which berth at which

 7  time?

 8    A   Yes, with -- in conjunction with my Army

 9  counterpart, we have a determined berthing of a

10  particular ship with a particular cargo at a given

11  time, in conjunction with the Kuwaiti authorities

12  who owned the port, obviously.

13    Q   And the -- I assume that there were other

14  people in your unit who were functioning as port

15  operations officers?  You weren't the only one?

16    A   I was named as port operations officer;

17  however, I had -- in my unit we had approximately

18  ten other military personnel who were acting as

19  watch standers and doing various other duties in


20  support of the operations.

21    Q   You had somebody -- somebody on watch

22  around the clock?

23    A   Yes.

24    Q   Okay.

00029

1           And you were not a watch stander

2   yourself?

3   A   No.

4   Q   Okay.

5           You supervised the watch standers?

6   A   Yes.

7   Q   Okay.

8           Now, the whole time from early

9   January to mid-November, you were working in the

10   same location in Kuwait or did you change at some

11   point?

12   A   For the most part.  That was our main

13   area of operations.  However, we were making some

14   trips to other facilities in the area that we had

15   an interest in, in operations.

16   Q   Can you tell me the -- give me the

17   identifier for the unit you were connected with

18   there?

19   A   Military sealift command, Kuwait.

20   Q   Kuwait.

21   A   That was the unit name.

22   Q   Okay.

23           That's the name of the reserve unit

24   you were connected with?

00030

1    A   The reserve unit that I was a member of

2   is military sealift command, Southern Persian Gulf

3   101.

4    Q   Okay.

5           And did that reserve unit to go to

6   Kuwait as a whole body, or was it individuals from

7   it that went to Kuwait to work with the MSC office

8   in Kuwait?

9    A   The initial deployment was a team of

10  approximately 12 to 14 people that came from that

11  unit.

12          The initial team that was to be

13  deployed I was part of.  But as a result of the

14  injury, I was not part of that initial

15  mobilization, because I was temporarily not fit for

16  duty because the injury.

17   Q   Okay.

18          Then let's go back and understand

19  about the earliest time.

20          When was the earliest point that

21  people from your 101 unit were sent into the

22  Persian Gulf?

23   A   We were advised in December that it was

24  possible that we were going to be deploying.

00031

1           February, the orders came, and that

2    team deployed.

3     Q    Okay.

4           Now --

5           MR. ANDERSON:  Which was a team he

6    had been on historically until he went not fit for

7    duty.

8     Q    That -- when you say team, that was less

9    than 100 percent of the unit?

10    A    Yes.

11    Q    Okay.

12          The unit consists of approximately

13    how many people, the reserve unit now?

14    A    At the time, I recall the unit being

15    approximately 30 people.

16    Q    And so of that people, a team of what did

17    you say, about 17 people were teed up to go to

18    Kuwait in early 2003?

19    A    It was approximately 12 to 14 people.

20    Q    Okay.  Sorry.

21          And the anticipation, I assume, was

22    that if you had gone in February of 2003, that you

23    would have returned approximately in September of

24    2003?

00032

1    A   Yes, that would be correct.

2    Q   Okay.

3        The people who did go in February of

4  2003, did they come back in September of 2003?

5    A   It was a start and return.  Some folks

6  came back as early as August and as late as

7  September.

8    Q   Was there a reason why the whole of the

9  unit didn't go on time?

10   A   I can't speak of what the rationale was,

11  because I was not there.

12   Q   But you were in communication with them?

13   A   I was, but I can't speak for what the

14  commanding officer at the time -- what his

15  reasonings were.

16       However, I could speculate, but --

17   Q   Well, I mean, I understand you didn't

18  read his mind, but -- I'm asking because I assume

19  there was some discussion around the unit as to the

20  particular logic that was employed in sending part

21  rather than all of the unit.

22       Did you hear or understand anything

23  to that effect?

24   A   No, I did not, because, for the most

00033

1   part, I was out of communication with the unit

2   because I was not allowed to be drilling with the

3   unit, so my communication level was a lot less than

4   what it had been when I was on duty.

5       Q    Okay.

6            Who was the CO of the reserve unit in

7   early 2003?

8       A    Captain John McNamara.

9       Q    And was Captain McNamara with you in

10  Kuwait when you eventually went in 2004?

11      A    No, he was not.

12      Q    Did he go with the group in 2003?

13      A    Yes.

14      Q    And are you still affiliated with that

15  unit today?

16      A    Yes.

17      Q    Drills in Quincy?

18      A    I'm affiliated with it, but I have not

19  served with them since my return.  As I'm still on

20  terminal leave --

21      Q    Right.

22      A    -- January of 2005 would be the earliest

23  I could return to the unit.

24      Q    Right.

00034

1          So you -- you're not going to go back

2    to ordinary activity as a reservist until you

3    finish being on active duty?

4      A    Correct.

5      Q    Okay.

6          So there's a drill scheduled sometime

7    in the next month that you would expect to attend?

8      A    Yes.

9      Q    Okay.

10          I'm sorry, did you say Captain

11    McNamara is still the CO there?

12      A    He is not.

13      Q    Who is now?

14      A    I do not recall the CO's name at this

15    time.

16      Q    And the unit drills at Quincy?

17      A    Yes.

18      Q    The Quincy Reserve Center?

19      A    Yes.

20      Q    Now, what was the -- strike that.

21          When you went the beginning of this

22    year to Kuwait was that another group that came out

23    of your Reserve Unit 101?

24      A    I was the only member from 101 that went

00035

1   at that time.

2           There were other units supporting the

3   command in Kuwait, and I filled one of the open

4   positions there.

5       Q   Okay.

6           So the other reservists that were

7   there with you in Kuwait at the Kuwait MSC unit

8   would have been people drawn from sister units, if

9   you will, in different parts of the country?

10      A   Yes.

11      Q   Okay.

12          Units of the same type as your own?

13      A   Yes.

14      Q   Okay.

15          And the unit type that you were in

16  was a unit that was designed to augment port

17  operations activities in overseas destination ports

18  such as Kuwait?

19      A   Yes.  We're responsible for a geographic

20  region, being the Persian Gulf.

21      Q   Okay.

22          Let me understand about -- you had

23  treatment on your left knee at some time in the

24  past?

00036

1     A    Yes.

2     Q    Okay.

3          And that was in -- was it 1999, did I

4     read?

5     A    Yes.

6     Q    Okay.

7          It was -- you were treated for it at

8     Cape Cod Hospital?

9     A    No, sir.  It was Falmouth Hospital.

10    Q    Falmouth Hospital.  Okay.

11         And what was the treatment for that

12    knee?

13    A    In 1984 I had sustained a torn ligament

14    in my left knee as a result of some college

15    intramural sports, and it degenerated over time,

16    and in 1999 needed surgery to repair the ligament.

17    Q    Okay.

18         Was there a particular incident while

19    you were in college?

20    A    It was just a sports injury I sustained.

21    Q    Well, that's what I'm trying to get at.

22         Was it some particular game?  Did you

23    get tackled or something?

24    A    It was flag football, so it was

00037

1    essentially touch football.

2      Q    Okay.

3            And what happened?

4      A    I got hit from behind in the legs, which

5    caused the injury.

6      Q    Hit from behind.

7            Were you running?

8      A    I was running with the ball.

9      Q    Right.

10     A    And I was hit from behind on the left

11    side.

12     Q    Okay.

13            So you were tackled even though it

14    was flag football?

15     A    Yes.

16     Q    Okay.

17            And were you treated at that?

18     A    I was treated.

19     Q    By medical facilities at Mass. Maritime?

20     A    I was seen by the clinic at Mass.

21    Maritime and referred to a -- an orthopedic surgeon

22    in Wareham, following treatment.

23     Q    So when you saw the surgeon in Wareham,

24    this was 1984; am I right?

00038

1    A    Yes.

2    Q    Okay.

3         Did you get treatment by the surgeon

4    in Wareham?

5    A    The -- yes, I did.

6    Q    And what was that?

7    A    I was put into a full leg cast for a

8    period of time.  I believe it was six weeks.

9    Q    And what was the diagnosis of what had --

10   of the damage that had been done by this hit in

11   1984?

12   A    As I recall, it was a torn ACL.

13   Q    Okay.

14        Was there -- did you have surgery

15   performed in 1984?

16   A    No, I did not.

17   Q    Okay.

18        Who is the surgeon in Wareham?

19   A    Dr. Johnson.  I don't recall his first

20   name, and I don't recall the clinic.

21   Q    Okay.

22        Did you have any kind of treatment of

23   that left leg between '84 and '99?

24   A    No.

00039

1    Q    Okay.

2         And was there a triggering event in

3    1999 that caused you to have treatment then?

4    A    Over time, I had instability in the joint

5    because of the ligament.  It was slightly

6    stretched, so it was not as tight as normal.

7         And over time, the constant shifting

8    loosened the whole thing up, and I would have

9    periodic instability where -- and in the fall of

10   1999 I sought medical care.

11   Q    Okay.

12        But did anything happen?  Did you

13   have a particular worsening in 1989 that caused you

14   to see a doctor then?

15   A    Yes.

16        I was painting my house and I was on

17   a ladder and descending the ladder at the time, put

18   full weight on my left leg as I was descending, at

19   which time it buckled and I fell approximately

20   three feet to the ground.

21   Q    Okay.

22        And when you say beforehand you had

23   experienced instability in this left knee, can you

24   describe for me the circumstances that you would

00040

1   notice this and what it is that you experienced

2   that you described as instability?

3      A   Certain movements would cause it -- if I

4   did a quick twisting movement, you know, descending

5   a ladder or walking or running would be typical of

6   the instances of instability.

7      Q   Okay.

8         So let's see if we can figure out

9   what's the sort of poster child for the position

10   that the way you would feel this instability would

11   be when your knee was partly bent in a standing

12   situation?

13      A   That would be one of them.

14      Q   Okay.

15         And when you say you would feel

16   instability, see if you can help me understand a

17   little more what you experienced.

18         Did you feel like you were not going

19   to be able to maintain the position?  That you were

20   about to collapse on the leg?

21      A   Yes.

22      Q   Okay.

23         And so that would cause you to favor

24   that leg because of the perception that it was not

00041

1  going to support you?

2      A    No.  I was a little bit more cautious in

3  what I did, but I didn't favor it to a point where

4  I eliminated any activities within reason.

5      Q    Did the treatment of that left leg get

6  reported to the people in the Navy that you were

7  then affiliated with?

8      A    They knew about the injury, but it did

9  not affect my duty status.

10     Q    Okay.

11          And they knew about it in what way?

12     A    In periodic physicals, there were

13  questions asked of hospitalization and/or injuries,

14  and that's when I would describe it.

15     Q    Okay.

16          Now, how frequently did you have

17  physicals for the Navy?

18     A    At least once every five years, as I

19  recall.

20     Q    Okay.

21          And before the time that you went on

22  the GREY LADY, went to work on the GREY LADY,

23  what's your best recollection of the last time that

24  you had a Navy physical?

00042

1    A    I don't recall the exact time.

2    Q    Okay.

3         But you think that would have come up

4  sometime after the surgery in 1999?

5         MR. ANDERSON:  When you're saying --

6  what are you referring to?

7         MR. RAUWORTH:  Navy physical.

8         MR. ANDERSON:  After the surgery and

9  before his injury on the GREY LADY?

10        MR. RAUWORTH:  Yes, sorry.

11        MR. ANDERSON:  That basically

12  three-year time period.

13   A    It was documented in my file.

14   Q    Before you went to work on the GREY LADY?

15   A    Yes, I believe it was in my file at that

16  time.

17   Q    Prior to the time that you had the

18  surgery of the left knee in 1999, had you reported

19  to anyone associated with the Navy that you had

20  experienced any instability with your left knee?

21   A    They were aware of the injury and the

22  treatment of it.

23   Q    In '84?  We're dating from '84.


24   A    The earliest time that I was with -- I

00043

1    was commissioned in the Navy in 1994.

2              It was at that time -- it was in my

3    file that this injury did exist.

4        Q    Okay.

5              So as part of your initial intake

6    screening, you had to tell them whether you had had

7    any kind of therapy or treatment or whatever for

8    physical conditions, and I assume that's what you

9    mean?

10       A    Yes.

11       Q    Okay.

12             So from 1994 to '99, did you make

13   anyone in the Navy aware that you were experiencing

14   instability with your left knee?

15             MR. ANDERSON:  I'm going to object,

16   because the question assumes that he was having

17   problems in '94 and '95, and I don't think that

18   that's been established at all, certainly --

19             MR. RAUWORTH:  You may answer.

20             MR. ANDERSON:  Let me just finish.

21             So I'm going to object to the extent

22   that the question presupposes a set of facts which

23   has not been established.  Any way he answers it,

24   it's adopting your assumption with it.

00044

    1            MR. RAUWORTH:  Well, Dave, if you

    2    want to make a speaking objection, then I'm --

    3            MR. ANDERSON:  Is it okay -- then --

    4            MR. RAUWORTH:  I --

    5            MR. ANDERSON:  I'm trying to

    6    establish that your question assumes if he answers

    7    the question, he's adopting that he had problems

    8    from '94 through '99, because you're asking him

    9    were they aware of these problems that you had

   10    between '94 and '99.

   11            If he says yes --

   12            MR. RAUWORTH:  You're compounding the

   13    sins because this sort of dialogue --

   14            MR. ANDERSON:  Then ask him a proper

   15    question, like when did you start having the pain,

   16    and then if he says '97 or '96, then you can say,

   17    okay, were they aware of that.

   18            MR. RAUWORTH:  Dave.

   19            I'm asking you to deal with your

   20    objections in a way that --

   21            MR. ANDERSON:  Well, I --

   22            MR. RAUWORTH:  Excuse me, don't

   23    interrupt me, please.

   24            In a way that do not constitute and

00045

1   cannot be construed as coaching the witness.

2          If you have a problem with the form

3   of the question, you and I can take --

4          MR. ANDERSON:  First of all, this

5   question has got absolutely nothing to do with the

6   case.  It has to do with his left leg.  It's got

7   nothing to do with the case, so we're just wasting

8   time; so why don't you go ahead and ask your silly

9   question, I will object, and I will object to the

10  form of the question, because it assumes facts

11  which have not been established.

12         Then he can answer and then we can

13  move on.

14         MR. RAUWORTH:  The obligation under

15  the rule --

16         MR. ANDERSON:  Go ahead.  Ask your

17  question.

18         MR. RAUWORTH:  Don't interrupt me,

19  Dave.  You're not the arbiter of the rules here,

20  okay.

21         MR. ANDERSON:  Okay, well --

22         MR. RAUWORTH:  And the rule is when

23  you have an objection, you state it in a form that

24  would be proper as at trial.

00046

1              And if your dialogue that you just

2    put on to the record --

3              MR. ANDERSON:  That's not.  That is

4    not the rule.

5              MR. RAUWORTH:  It is the rule.

6              MR. ANDERSON:  The rule is to do it

7    so you have an opportunity to cure your question.

8              MR. RAUWORTH:  And I can pursue with

9    you greater detail if I want to, and I can do that

10   off line, as we would do at side bar if we were at

11   trial.

12             MR. ANDERSON:  Look, just ask your

13   question.  I'm not going to argue about this.  The

14   whole point is so you can cure it.

15             MR. RAUWORTH:  I'm putting you on

16   notice in case I have to take it to the Court.

17             MR. ANDERSON:  We're obviously not

18   going to do it on this stupid question because it's

19   got nothing to do with the case.  We're talking

20   about from '94 to '99 and his left leg.

21             MR. RAUWORTH:  I'm alerting you that

22   the way you're doing this is needless and improper.

23             MR. ANDERSON:  I don't want to argue.

24             MR. RAUWORTH:  If you don't want to

00047

1  argue, then comply with the rule, okay?

2          MR. ANDERSON:  Then ask your

3  question.

4          MR. RAUWORTH:  Comply with the rule.

5  I'm happy to work it out with you --

6          MR. ANDERSON:  Just ask your

7  question.  Ask.  Let's move on.

8          MR. RAUWORTH:  Well, the notice is

9  established.

10  BY MR. RAUWORTH:

11     Q   You had given me to understand earlier

12  that you had experienced instability at various

13  times prior to your surgery on your left knee in

14  1994.

15          Did I understand that correctly?

16          MR. ANDERSON:  And I'm going to

17  object.

18          MR. RAUWORTH:  Let me withdraw the

19  question.

20          MR. ANDERSON:  You're misstating --

21          MR. RAUWORTH:  I'm going to withdraw

22  the question, and you have no basis to object to

23  it.

24          MR. ANDERSON:  You're stating what

00048

1  you understood --

2          MR. RAUWORTH:  If the question is

3  withdrawn there's nothing to object it.

4          MR. ANDERSON:  Okay, well, go ahead,

5  ask your question.

6          MR. RAUWORTH:  And I'm repeating my

7  notice.

8          MR. ANDERSON:  Go ahead.

9  BY MR. RAUWORTH:

10     Q   You had instability in your left knee

11  prior to 1999; is that correct?

12     A   Yes.

13     Q   Okay.

14          And you had experienced it on a

15  number of occasions prior to 1999; is that correct?

16     A   Yes.

17     Q   Okay.

18          So at any time between the time you

19  joined the Navy and the time that you had the

20  surgery on your left knee in 1999, did you make any

21  one connected with the Navy aware of your

22  experiences of instability?

23     A   The instability was infrequent enough

24  that it did not affect my overall status, in my

00049

1   opinion.

2          It was not interfering with my

3   duties, whether it be military or civilian.

4    Q   And from that, I infer that the answer is

5   no, you did not inform anybody?

6    A   They knew of the injury, the initial

7   injury and the treatment.

8    Q   Okay.

9          My question has to do with the

10  instances of instability that you experienced

11  leading up to 1999.  That's what I'm focusing on

12  with the question of whether you made anyone with

13  the Navy aware of that?

14   A   No, I don't --

15   Q   Okay.

16   A   -- recall ever advising them that there

17  was instability in the joint because of the -- it

18  was so infrequent, it was not hampering my ability

19  at the time.

20   Q   Okay.

21          You also didn't make any of your

22  civilian employers aware of that, of the instances

23  of instability?

24   A   No.

00050

1           Again, it was not stuff -- it was

2    infrequent enough that it was not hampering my --

3    any of my duties, whether it be military or

4    civilian.

5        Q    Okay.

6           Was the doctor that did your surgery

7    on your left knee the same one that did the surgery

8    on your right knee in 2002?

9        A    No.

10       Q    Okay.

11          I'm sorry, did you --

12          Something I think I've seen suggested

13   that you had been making plans to have the same

14   doctor that had worked on you in 1999 deal with the

15   situation in 2002.

16          Did I misunderstand that, or had you

17   made -- let me withdraw that question.

18          Had you made any efforts toward

19   having your 2002 condition treated by the same

20   surgeon who did the work in 1999?

21       A    I was referred to McWilliam by Cape Cod

22   Hospital as the orthopedic surgeon to see for that

23   injury to my right leg.

24       Q    Okay.

00051

1    A    And as such, I followed through with that

2    referral.

3    Q    Okay.

4         Did you make any inquiries or take

5    any steps toward having the same doctor that had

6    treated you in '99 work on you in 2002?

7    A    I did not.

8    Q    Okay.

9         There's a reference in the

10   interrogatory answers to chest pains at some point

11   that you were seen about.

12        What was the time frame of that?

13   A    That was January 2001 in which I woke up

14   with some chest pains, and I went to the Falmouth

15   emergency room to have them checked out.

16   Q    Okay.

17        What was the diagnosis at that stage

18   of the game?

19   A    Strained intercostal muscles.

20   Q    And was there any treatment provided?

21   A    No.

22   Q    Okay.

23        A while ago Mr. Anderson was going

24   through the calculation of lost wages, some of the

00052

1  elements of it.

2        He mentioned a period of service on a

3  Maersk ship that you had anticipated; do you recall

4  hearing that?

5    A   Yes.

6    Q   What's the ship and what's the time

7  frame?

8    A   The time frame would have been

9  approximately August/September time frame.  The

10  ship was to be determined.

11    Q   Okay.

12        To be determined by whom?

13    A   The crewman coordinator at Maersk.

14    Q   And what -- how was it -- how would it be

15  determined in what capacity you would go to a

16  Maersk ship?

17    A   It was based on the time frame I was

18  ready to go back to work and any openings they had

19  on a particular ship, as well as the -- your grade

20  of license.

21    Q   Okay.

22        And in -- throughout the year 2002,

23  you held an unlimited master's license?

24    A   That's correct.

00053

1    Q   Okay.

2          And your previous tour on a Maersk

3  ship had been the one that ended just prior to

4  working on the GREY LADY, you had been working in

5  what capacity?

6    A   Chief officer.

7    Q   Okay.

8          And you had been sailing with Maersk

9  since about when?

10    A   The fall of 1998.

11    Q   The fall of 1998 through the summer of --

12  well, spring of 2002, right?

13    A   Correct.

14    Q   Okay.

15         How many different tours did that

16  represent?

17         Or maybe a quicker way to say it was

18  what was the typical schedule like?

19    A   I was generally working a four-months-on-

20  four-months-off rotation.

21         There was some time in there I know I

22  worked a longer period of time than the standards

23  four-month rotation.

24    Q   Okay.

00054

1           And the standard four months'

2    rotation was -- was that a matter of your choice or

3    the company's choice?

4       A    Company's choice.

5       Q    Okay.

6           And when you worked longer, how did

7    that come about?

8       A    It was -- that was as a result of a

9    promotion.  I had -- was just finishing up a tour

10   in one grade.  I was offered a promotion and

11   another ship, in which case I probably had a couple

12   of weeks off and then went right back to work and

13   did another four-month rotation.

14      Q    Okay.

15          Were all the Maersk tours with what

16   they call the gray funnel line, ships basically

17   operating for the Navy?

18      A    Maersk had contracts with the Navy,

19   operating various classes and types of ships, in

20   addition to commercial vessels.

21          I was primarily employed in

22   government programs.

23      Q    Primarily but not always?

24      A    My employment with them was with

00055

1  government programs.

2     Q    So each of your assignments was on a

3  government-chartered ship?

4     A    Yes.  It was a government-owned ship,

5  operated by Maersk for the government.

6     Q    Okay.  All right.

7          But your employer was Maersk and your

8  paychecks came from Maersk?

9     A    The employer was Maersk.  The checks came

10  from Maersk, but I was a member of AMO, which

11  provided manpower to Maersk.

12    Q    Right.

13    A    But Maersk had an exclusive manning

14  agreement with AMO in that they would retain

15  individuals.

16    Q    Okay.

17          What different grades -- did you sail

18  for Maersk as first and second mate as well?

19    A    When I joined Maersk, my initial tour was

20  that of chief mate on an ocean surveillance ship.

21          When I finished that tour, I was

22  offered a position on the -- on another class of

23  ship if -- and my initial employment on that new

24  class of ship was that of third mate, and once I

00056

1   completed that initial tour, I was promoted to

2   chief mate, chief officer.

3       Q    Okay.

4            So you sailed as chief mate on a

5   surveillance ship.  I assume that was of limited

6   tonnage?

7       A   It was of limited tonnage.  At the time I

8   held an unlimited master's license.

9       Q    Okay.

10           So you did one tour on the ocean

11  surveillance ship and then shifted into

12  cargo-carrying ships for Maersk?

13      A   Yes.

14      Q   And when you made that shift, you started

15  out as third mate for how long?

16      A   Approximately three months.

17      Q   Okay.

18           And at the end of that three months,

19  your next tour was as chief mate?

20      A   Yes.

21      Q   Okay.

22           On the same ship or a different ship?

23      A   Same ship.

24      Q   And did you leave it in the meantime or

00057

1   did you just take over the chief mate's job?

2       A   I took some leave, and I met the ship at

3   another port after my leave period.

4       Q   Okay.

5           That was all overseas?  You stayed

6   overseas?

7       A   My initial employment on a cargo vessel

8   was, she was in Norfolk, Virginia, and I joined the

9   ship again in Greece.

10      Q   Okay.  All right.

11          The tours you did with Maersk after

12  the ocean surveillance ship, were they principally

13  on the same ship?

14      A   Yes, I was on the -- I was on one ship

15  for a period of time, and then I was moved to

16  another ship, and I -- I did several tours on each

17  of them.

18      Q   Okay.

19          What were those two that you did the

20  most time on?

21      A   USNS BOB HOPE and USNS RED CLOUD.

22      Q   And the BOB HOPE was before the RED

23  CLOUD?

24      A   Yes.

00058

1    Q    Okay.

2            What kind of a ship was the BOB HOPE?

3  What did it carry?

4      A    They were classified as large medium-

5  speed roll-on/roll-off ships.  They carried

6  military cargo of all descriptions.

7    Q    Okay.

8            Now, that's true of both of them?

9    A    Yes.

10    Q    Okay.

11            Were they -- were those two ships of

12  the same class?

13      A    They were both classified as LMSRs,

14  however, they were two different hull types --

15    Q    Okay.

16    A    -- within the class.

17    Q    All right.

18            So, for example, the deck and ramp

19  arrangement might have been different on the two?

20    A    Yes.

21    Q    Okay.

22      A    They did the same work and virtually the

23  same equipment, but the hulls were laid out

24  differently.

00059

1     Q    Okay.

2           And were they involved in --

3     typically involved in loading a cargo, carrying it

4     to another port and discharging it, or carrying

5     what's referred to as pre-position type cargo?

6     A    Both.

7           BOB HOPE was initially going to be

8     loaded out for a pre-position mission.  The -- when

9     I joined her again in Greece, we were involved in

10     moving military cargo for Kosovo operations.

11          And when we completed that mission,

12     we went back into a pre-position mission.  And RED

13     CLOUD was pre-position as well.

14     Q    RED CLOUD was pre-position throughout

15     your whole association with it?

16     A    Yes.

17     Q    Okay.

18          So in -- if I'm understanding the

19     nature of the operation correctly, the RED CLOUD

20     either rarely or never loaded or discharged its

21     cargo?

22     A    The time on board we had cargo that was

23     pre-positioned.  There were instances in which we

24     had to offload a portion of it.

00060

1           However, the main mission was

2    standing by for a potential movement.

3       Q    And the standby point was typically Diego

4    Garcia?

5       A    Correct.

6       Q    They have a lagoon there?

7       A    Yes.

8       Q    So you were commonly spending time

9    anchoring in the lagoon?

10      A    We were at anchor a portion of the time.

11          We were underway for another period

12   of time.  Both locally and we were underway to

13   other areas in that region, both on the BOB HOPE

14   and RED CLOUD.

15      Q    Okay.

16          The deck -- the typical activities of

17   the RED CLOUD would include being underway for at

18   least a few days every few months?

19      A    Be a few days -- a few days per month.

20      Q    Okay.

21          And occasionally some longer

22   passages?

23      A    Correct.

24      Q    For purpose of taking fuel or what?

00061

1     A    For the purposes of periodic maintenance

2    or the wishes of the commander in charge of our

3    group.

4     Q    Okay.

5            Neither of these ships were set up

6    with the expectation of doing at-sea replenishment,

7    underway replenishment?

8     A    They were not configured for underway

9    replenishment.

10    Q    Designed to discharge principally in a

11    developed port supported with ramps?

12    A    These ships were designed to do both,

13    established ports and offload at a beachhead.

14    Q    Okay.

15            Now, as chief mate, can you describe

16    what your -- of these MSC ships, can you describe

17    what your duties were?

18    A    My primary duty was -- I was chief

19    officer, which is second in command of the vessel.

20    I was in charge of all cargo, of the loading of the

21    cargo, offloading of it, the ensuring that it was

22    securely latched and properly maintained.

23            In addition, I had collateral duties,

24    that of the commander of the fire brigade, ship's

00062

1   medical officer.

2         I also did -- was responsible for the

3   training of the crew.  Also the daily operations of

4   the deck department.

5     Q    Did those ships have a bosun?

6     A   They did.

7     Q    Bosun reported to you?

8     A   Yes.

9     Q    So you would basically set out the work

10  program for the day workers and the deck crew to

11  carry out?

12    A    Correct.  And I would continue

13  supervising them throughout the day.

14    Q    Bosun function is the foreman, typically,

15  of what the deck crew was doing?

16    A    Correct.

17    Q    Okay.

18         Did those ships have someone

19  expressly designated as a safety officer?

20    A    Every member of the crew was -- had a

21  role in safety.

22         Typically, the second officer was by

23  default classified as the safety officer.

24    Q    Tell me about the concept of by default

00063

1   and that --

2       A   I oversaw all the operations within the

3   deck department.  I had people -- I had two other

4   officers working for me which I directed their

5   activities.

6       Q   The second and third mate?

7       A   Yes.

8           Each had their own responsibility,

9   and they reported directly to me.

10          So I was in overall charge of the

11  entire deck department and ship.

12      Q   Meaning -- okay, meaning all of the

13  unlicensed people assigned to the deck department

14  and the bosun and the two union your mates?

15      A   Yes.

16      Q   Okay.

17          And the two junior mates reported to

18  you in all their activities other than in being on

19  watch on the bridge?

20      A   Yes, unless I was directed by the master

21  in a supervisory position, if we were in a long

22  transit.

23      Q   All right.

24          In other words, you might sometimes

00064

1   stand as a supervisor of the second and third mate

2   in their bridge activities?

3       A   Correct.

4       Q   If so designated by the master?

5       A   (Witness nods.)

6       Q   Now, your last assignment with Maersk was

7   with the RED CLOUD?

8       A   Yes.

9       Q   And that was from when to when?

10          I think something indicated March of

11   2002 was the end date.

12      A   It was late October, early November I

13   joined the vessel.

14      Q   And got off in March?

15      A   Approximately, yes.

16      Q   Okay.

17          So approximately -- and that had been

18   the routine you had been on with the RED CLOUD for

19   several tours, four months on, four months off?

20      A   Yes.

21      Q   Okay.

22          Was there another individual who was

23   typically chief mate while you were ashore?

24      A   While I was on leave, there was another

00065

1  gentleman that he and I switched off together.

2    Q    Okay.

3          A specific guy, someone you knew?

4    A   Yes.

5    Q    Okay.

6          And so you -- you were relatively

7  confident that he would be your relief when you

8  left and he would be your relief when you returned?

9    A    At the time of the turnover process, yes.

10          But during our leave time, you did

11  not know if that person would be back until the

12  turnover date was determined and arranged.

13    Q    And that was -- there was somebody at

14  Maersk who set those dates and was in communication

15  with the people who would be involved in the

16  reliefs?

17    A   Yes.

18    Q    Okay.

19          Somebody stateside at Maersk,

20  somebody at Norfolk?

21    A   Yes.

22    Q    Okay.

23          Was that person called a dispatcher

24  or something?

00066

1    A   Crewman coordinator.

2    Q   Okay.  In Norfolk?

3    A   Yes.

4    Q   Okay.  All right.

5        Let's -- let me understand the time

6   you spent with Hyannis Harbor Tours.

7        Did you go to work with them right

8   after you came ashore from the RED CLOUD?

9    A   As I recall, it was within a few weeks.

10  It wasn't immediate.

11   Q   Okay.

12       And it was -- you started working

13  with them before their operating season?

14   A   Yes.

15   Q   Okay.

16       And you were doing what for them?

17   A   I was initially hired to work in the

18  maintenance department.

19       I was initially hired to work in the

20  maintenance department and expected to be employed

21  on board the ferries during the season.

22   Q   And the maintenance department was --

23  that work, I assume, was getting the vessels ready

24  for when the tourist season came along for the

00067

1  summer?

2     A   That's correct.  That's correct.

3     Q   Okay.

4           So at that time, you didn't have

5  association with any particular vessel?

6           Do I have that right?

7     A   I worked on many of the company's

8  vessels, not any one in particular.

9     Q   But typically when they were tied up

10 somewhere?

11    A   Yes.

12    Q   Okay.

13          Doing what sort of things for them?

14    A   Cleaning, chipping of paint, painting,

15 things of that nature.

16    Q   Okay.

17          And that work in maintenance, did

18 that stop as soon as the boats began to operate?

19          In other words, did you begin to get

20 underway with those folks as soon as any of their

21 boats got going?

22    A   At a time when the season was beginning,

23 there were those of us in the maintenance

24 department that were going to be designated as

00068

1   crews for the boats.  I was chosen to work aboard

2   the GREY LADY, so I started on board in the June

3   time frame.

4       Q    Okay.

5       A    May or June time frame.

6       Q    So when you began to work aboard her

7   underway, you began in what capacity?

8       A    As deckhand.

9       Q    Okay.

10          Now, the GREY LADY is a catamaran

11  ferry?

12      A    Yes.

13      Q    Well, actually, we should clarify.

14          This is the GREY LADY II, correct?

15      A    GREY LADY II, that's correct.

16      Q    Okay.

17          And would -- all the time you were

18  connected with her, she was always in service to

19  Nantucket?

20      A    Yes.

21      Q    Okay.

22          What was the -- what was the size of

23  the crew on board, the composition?

24          How many people worked that boat?

00069

1    A    There was a captain, a mate and two

2    deckhands along with an employee working the

3    concession stand.

4    Q    For a total of five?

5    A    Yes.

6    Q    Was that the way that they always ran it,

7    in your experience?

8    A    In my experience, yes.

9    Q    Okay.

10        So when you began the season with the

11    GREY LADY, you were on the beginning runs, I take

12    it?  You started out the season when that vessel

13    began the season?

14    A    The season operate -- excuse me, the

15    vessel operates year round.

16    Q    Oh, oh, okay.

17        What was the occasion that sort of

18    brought you into involvement with it in June?

19    A    It was at the pleasure of the owners and

20    the operator, the operations officer.

21    Q    Okay.

22        When you first got in touch with

23    Hyannis Harbor Tours and went to work with them,

24    did you have an expectation or an objective that

00070

1  you would be working ashore or on -- you know,

2  operating underway with one of the vessels or did

3  you have a preference?

4    A    My expectation in seeking employment with

5  them was to eventually work with them underway on

6  boats.

7    Q    All right.  So in June, you began with

8  the GREY LADY as a deckhand.

9        And how long did you continue with

10  that vessel as a deckhand?

11    A    As I recall, I was -- started as deckhand

12  in I believe it was late May.  And then in June, I

13  was promoted to mate on the GREY LADY.

14    Q    Okay.  Okay.

15        So a period of just a few weeks as

16  deckhand?

17    A    As I recall.

18    Q    Okay.  And then from the time you began

19  to sail as mate, did you ever sail with them in any

20  other capacity other than mate up until the time of

21  the injury?

22    A    I did help out one evening as a deckhand

23  on another boat.

24    Q    Somebody didn't show up and they

00071

1  needed --

2     A   They needed some extra -- there was an

3  event.  One of the boats was chartered for an

4  event, and I helped out as a deckhand.

5     Q   Okay.

6         But from the time you first served as

7  mate on the GREY LADY until the time of your

8  injury, you were always working as mate whenever

9  you sailed on that boat?

10    A   On the GREY LADY, I was mate.

11    Q   Okay.

12    A   But, as stated, there was a time in my

13  off time -- I worked several days, had a couple of

14  days off.

15        In my off time is when I filled in on

16  the other boat for that one evening.

17    Q   Right.

18    A   Okay.

19    Q   Okay.

20        What were the responsibilities that

21  you had as mate on the GREY LADY?

22    A   I assisted the master with navigation.  I

23  also was -- oversaw the activities of the

24  deckhands, in addition to the embarkation and

00072

1  disembarkation of passengers and the loading and

2  offloading of luggage and personal belongings, as

3  well as the cleaning and basic maintenance of the

4  vessel.

5      Q    Now, did that vessel operate seven days a

6  week?

7      A    Yes, unless it was out of service for

8  repairs or whatever.

9      Q    But my point is it was scheduled for

10  seven days a week?

11      A    Yes.

12      Q    At least during the summer when you were

13  on it?

14      A    As I recall, the vessel operated seven

15  days a week year round with the exception of some

16  holidays.

17      Q    Okay.

18          And what sort of a schedule did you

19  have personally in terms of your own work on board

20  once you began to serve as chief mate?

21      A    Daily schedule or work --

22      Q    I'm sorry, days on, days off.

23      A    As I recall, it was three or four days

24  on, a day or two off.

00073

1     Q    Okay.

2            And the three or four days on would

3    typically be in sequence as opposed to broken up?

4     A    Yes, it would be in sequence.

5     Q    Okay.

6     A    And on your day off, you would transit --

7    one week you would be on the day shift.  On your

8    day off, that's when you -- the crews transition to

9    the opposite schedule.

10            So there was a day shift and a night

11    shift.

12     Q    Oh, oh, all right.

13            So the -- in other words, the

14    vessel's schedule kept it running longer than 12

15    hours?

16     A    Yes.

17     Q    Okay.

18            So the day shift covered what hours

19    and the night shift covered what hours?

20     A    Day shift covered from approximately

21    6:30 to approximately 3:00 p.m.  Then 3:00 p.m. to

22    roughly 11:00 p.m./midnight, given the schedule.

23            There were more runs on the weekend

24    than there were during the week, so...

00074

1     Q    Right.

2          And did they set it up so that when

3     you were on board as chief mate, you were always

4     with the same people who -- as master, deckhand and

5     concession worker?

6     A    Typically.

7     Q    Okay.

8          And so for most of the time, you

9     were -- you were working with the skipper who was

10    the skipper that was on board the day of your

11    incident?

12    A    Yes.

13    Q    Okay.

14         So for that vessel, did the company

15    have --

16         Sounds like they must have had three

17    complete crews in order to do rotations?

18    A    That's fair to say.  There was some

19    overlap, but three dedicated crews, I'm not sure.

20    Q    Well, would it have been --

21    A    There were cases in which there were

22    people that -- people joined the vessel to fill in

23    on a crew's day off.

24    Q    Right, okay.

00075

1            MR. ANDERSON:  Quick break?

2            MR. RAUWORTH:  Sure.

3            (Recess.)

4            MR. RAUWORTH:  What was the last

5  question?

6            (Record read as requested.)

7  BY MR. RAUWORTH:

8    Q    All right.

9            Was the loading point at Hyannis

10  always the same as long as you were on that vessel,

11  the loading setup?

12    A    Yes.

13    Q    Okay.

14            How about at Nantucket, did that stay

15  the same?

16    A    Yes.

17    Q    Okay.

18            Now, during the time in port at

19  either end, did you have supervision over the

20  person that worked at the concession stand?

21    A    Generally, no.  They were under direction

22  of the food and beverage manager.

23            However, while on board the vessel,

24  they did come under our purview as far as safety.

00076

1    Q   Okay.

2       What did the -- what did the GREY

3  LADY have by way of requirements on the certificate

4  in terms of people required to be carrying, was it

5  four or five?

6    A   As I recall, the certificate required a

7  master, mate and a couple of deckhands.

8    Q   All right.

9       And while the vessel was underway,

10  you would typically be on the bridge?

11    A   I alternated with the deckhands.  The way

12  the captain liked to organize the underway period

13  is that he was always on the bridge at all times.

14       The deckhands and the mate would

15  alternate as helmsman under his direction.

16       So at various points during the day,

17  I would be acting as helmsman, and when I was not

18  in such capacity, I would be making rounds about

19  the vessel, checking the security of it, checking

20  on the passengers, rounds to the engine room.

21    Q   Okay.

22       And the time it took to make a run

23  between Hyannis and Nantucket was about how long?

24    A   Approximately one hour.

00077

1      Q    Okay.

2            This vessel normally operated once it

3    got out of the harbor at about what speed?

4      A    It varied with weather conditions and sea

5    conditions.  But typically, approximately 28 knots.

6      Q    Okay.  All right.

7            Now, the situation in Nantucket on

8    the day of incident, how was this vessel tied up in

9    Nantucket?

10     A    The vessel is tied up with a spring line,

11   aft-leading spring lead, a head line and a stern

12   line with the engines clutched ahead.

13     Q    Okay.

14           Was the -- well, where on the --

15           Let me back up.  How many gangways or

16   ramps were there in use typically when you were in

17   port at Nantucket?

18     A    One.

19     Q    Okay.

20           And whereabouts on the vessel did

21   that come aboard?

22     A    The aft portion of the vessel.

23     Q    Okay.

24           And how was it connected to the

00078

1   vessel when you were alongside and using it?

2       A   It was laid between the pier and the

3   vessel and, as I recall, the -- it slipped into a

4   notch on board the boat.

5       Q   Along the deck edge?

6       A   Yes.

7       Q   Okay.

8           And then it had wheels at the bottom?

9       A   At Nantucket, I believe it did not.  I

10  believe the gangway did not have wheels on it.

11      Q   If there was movement of the vessel, it

12  would skid on the surface of the dock?

13      A   Yes.

14      Q   Okay.

15          And what was the routine in terms of

16  what would happen -- let me back up.

17          What was the point in the time at

18  Nantucket that the baggage would come off?  Would

19  this be after the passengers had come ashore?

20      A   After tying up, you would immediately

21  disembark the passengers and then proceed to

22  immediately offload the luggage carts.

23          And if -- depending on the wishes of

24  the master and how things were laid out, you would

00079

1  begin boarding the passengers for the turnaround

2  trip.

3      Q   Okay.

4           And then the luggage would come back

5  aboard last?

6      A   Not always.  Depending on if the

7  passengers were ready to board or not.  Some cases,

8  if the off-going luggage was completed and luggage

9  ready to come on board was ready to go, then we'd

10  do that and take the passengers on last.  It was

11  not always done in the same sequence.

12      Q   Okay.

13           Now, where was it that you -- where

14  were you physically, what location were you with

15  respect to this vessel when you became aware that

16  you were hurt on the day of this incident?

17      A   I was transiting up the gangway.  I was

18  returning to the boat to take off another luggage

19  cart.

20      Q   Okay.

21           And what happened?

22      A   As I was running up, I planted my right

23  foot, and I either stepped on something, slipped on

24  something that caused my -- my knee to buckle, and

00080

1    it went out, and I fell forward into the railing

2    and that's the time I injured myself.

3    Q    So this was a -- how long was this ramp?

4    A    Approximately eight to ten feet long.

5    Q    Okay.

6        And you were midway up the ramp or

7    what?

8    A    Approximately.

9    Q    Okay.

10        So you say you felt your knee buckle,

11    and you -- then what happened?  You fell how?

12    A    I fell into the side rail of the gangway.

13    Q    The right-hand side rail?

14    A    Yes.

15    Q    Okay.

16        Now, the surface of the gangway that

17    we're talking about here is what, how -- what's the

18    surface like?

19    A    It's an aluminum gangway with tread

20    material, aluminum tread material.

21    Q    Okay.

22        Can you help me understand the --

23    what you mean by tread material?

24        What is the -- what's the surface

00081

1  like?

2      A   I don't know the exact terminology of it,

3  but it looks like it was a single piece of aluminum

4  that was stamped.  And in the machining, the edges

5  of the stamp turned upward to form a tread.

6      Q   Like teeth?

7      A   That would be a fair characterization.

8      Q   Okay.

9          Now, what was it that -- you

10  mentioned something that you reckon caused you to

11  slip.

12          What was that?

13      A   I don't know what the object or substance

14  was.  There was something that caused me to -- that

15  caused my knee to buckle.

16      Q   Okay.

17          You never saw anything?

18      A   I did not.

19      Q   And nobody else did, as far as you know?

20      A   Not that I recall, as far as I know.

21      Q   Okay.

22          You didn't turn around and look for

23  it?

24      A   I was too concerned with ensuring my own

00082

1  safety, checking myself out and getting myself off

2  the gangway.

3          I immediately -- immediately

4  following the incident, I got myself up and on

5  board the boat.

6    Q   Okay.

7          And once you got on board, you stayed

8  in one place?

9    A   I stayed in one spot to typically -- to

10  look at what happened, to see if there was any

11  blood or anything.

12          I was assessing the injury, and

13  immediately following that, I stood up and I made

14  my way back out to the pier with the captain and --

15  advising him what happened.

16          And it was that point we -- the

17  luggage was being brought on and the passengers

18  were embarking.

19          Immediately following that, we got

20  underway.  I went up to the wheel house with the

21  captain.  I sat down.  We talked about what took

22  place, and I sat out the rest of the trip.

23    Q   Okay.

24          So when you felt your knee fail you,

00083

1  basically you caught your weight on the right hand

2  rail going up?

3      A    Yes.

4      Q    Okay.

5           So you didn't actually fall to the

6  surface of the ramp?

7      A    There may -- I may have touched it,

8  touched down with it; but most of my body weight I

9  caught on the rail.

10     Q    Were you wearing shorts, long pants, or

11 what?

12     A    Long pants.

13     Q    Did you find any blood on your pants?

14     A    Negative.

15     Q    Okay.

16          Now, when you got ashore, did you

17 have any involvement in the work of the ship at the

18 Hyannis end?

19     A    No, I -- I could not fulfill my duties.

20 I was in a terrible amount of pain.  My knee was

21 swollen.  The minute we got to Hyannis, I got off

22 the vessel and went to Cape Cod Hospital.

23     Q    How did you get there?

24     A    I drove myself.

00084

1   Q   Okay.

2       And what happened at Cape Cod

3  Hospital?

4   A   I went to the emergency room for

5  treatment and they took some x-rays, and I saw a

6  doctor. And upon reviewing them and interviewing

7  me, doing an exam, he suspected it was an ACL tear

8  but could not confirm it.

9   Q   And how long did you stay there?

10   A   Probably a few hours.

11   Q   Okay.

12      Were you provided with any treatment

13  or therapy or remedy while you were there that

14  first occasion?

15   A   I was put into a straight-leg brace, some

16  crutches, advised to take either Advil or Motrin

17  for the pain and that's when I received the

18  recommendation for a follow-up with the surgeon.

19   Q   Okay.

20      By a straight-leg brace, I assume you

21  mean something that was basically fabric and Velcro

22  that you wrap around your leg?

23   A   Yes.

24   Q   Okay.

00085

1     A    Which prevented the -- any movement of

2    the knee.

3     Q    All right.

4          You understood the objective of that

5    to basically diminish the amount of flexing that

6    you need when you --

7     A    Yes, it's to immobilize it.

8     Q    Right.

9          And you -- how long did you spend at

10   Cape Cod Hospital that night?

11    A    A few hours.

12    Q    And when were you next seen?

13    A    A few days later, by Dr. McWilliam, after

14   making the necessary appointment.

15    Q    Which began the process of evaluation

16   with an eye toward surgery?

17    A    Yes, yes.

18    Q    Okay.

19          And once you saw Dr. McWilliam, did

20   he change in any way your orders or your regimen

21   from what you had gotten coming out of the

22   emergency room?

23    A    No.  It was pretty consistent, as I

24   recall.

00086

1    Q   Okay.

2       As I recall, you mentioned earlier

3  you used the crutches for about two weeks following

4  the initial incident?

5    A  Approximately.

6    Q  And what about the leg brace, how long

7  did that carry on?

8    A  About the same amount of time.

9    Q  Okay.

10    A  I don't recall the exact time.

11    Q  Right.  All right.

12      Now, going back to the ramp, when

13  this originally began, what is it that your foot

14  did at the moment that you felt you were losing it

15  and going into the rail?

16    A  Either stepped on something off center or

17  slipped on something that caused my weight to go

18  one direction, whereas my --

19      My upper half go in one direction and

20  my bottom half go in another direction, thereby

21  creating a twist movement that caused the injury.

22    Q  So this is when your right foot was --

23  you were taking a step forward with your right

24  foot?

00087

1   A   Yes, as I was planting it --

2   Q   Yes.

3   A   -- there was something that caused --

4  either an object or a substance on it, on the

5  gangway that I did not see that ultimately caused

6  my knee to buckle.

7   Q   And how did your right foot move?

8   A  I can't say specifically how it moved.

9   Q   So you're not sure if it moved left or

10  right or backwards or forwards?

11   A  I do not know.

12   Q   Okay.

13       You got to the top of the ramp -- did

14  I understand correctly that you spoke to the

15  captain fairly immediately?

16   A   Yes.

17       Once I got back down to the pier,

18  that's when I first told him of --

19   Q  He was on the pier at the time?

20   A  He was on the pier.

21   Q   Okay.

22       So you went to the top of the ramp?

23   A  I went to the top of the ramp and into

24  the vessel --

00088

1     Q    Yes.

2     A    -- the stowage area of the vessel --

3     Q    Right.

4     A    -- to assess myself, collect myself.

5          And then I proceeded out back to the

6    pier and advised the captain what happened.


7     Q    Okay.

8          And what did you tell him about what

9    happened?

10    A    I told him I twisted my knee on the ramp,

11   that it was swelling up.  I was in a lot of pain.

12   He could see that I was in a lot of pain.

13          And we continued to board the

14   passengers and left for Hyannis as soon as that was

15   complete.

16    Q    Okay.

17          Did you talk to any of the other crew

18   members about what had happened to you?

19    A    I think I mentioned something in passing

20   that I did hurt myself and I would not be able to

21   help them with the rest of the luggage and that

22   they would have to finish up and secure the deck.

23    Q    Okay.

24          How is it that the ship could have

00089

1  prevented this accident from happening?

2      A    Better illumination.  Reduce the need for

3  rushing and hurrying in the turnarounds.

4      Q    And how is it that illumination would

5  have made a difference?

6      A    Because I would have been able to see the

7  gangway clearly enough to see what, if anything,

8  was on it.  See if there was -- at the time of the

9  accident, I recall the illumination to be not

10  adequate.  Could not see every bit of the surface

11  of the gangway.

12      Q    What did you do, if anything, to make

13  sure that there was nothing on the gangway as

14  passengers began to board for their return trip?

15      A    That instant?  At that time of the night?

16          Before passengers are boarding,

17  the -- there's a person that's manned at the

18  gangway that ensures that the boarding is

19  conducted safely.  And at the same time that's

20  where tickets are collected.

21      Q    Right.

22          But after you began to feel pain,

23  what did you do to make sure that the passengers

24  who were about to board did not experience a trip,

00090

1  slip or stumble on the gangway?

2     A   I personally didn't do anything.  I can't

3  speak for the others.

4     Q   Well, did you alert the captain that

5  there was something that you slipped on?

6     A   I advised the captain when I first spoke

7  to him, I said I twisted my knee on the gangway,

8  and I immediately advised him of that, as well as

9  the engine room.

10     Q   Okay.

11          I understand that you told him that

12  you twisted your knee.  I understand that, but I

13  want to move to a related question that's somewhat

14  different.

15          And my question is, that's different

16  is, what did you say to the captain, if anything,

17  with regard to correcting the condition that you

18  seem to believe caused your foot to trip or slip?

19          MR. ANDERSON:  Are you talking about

20  the lighting?

21          MR. RAUWORTH:  I'm talking about

22  the --

23     Q   Well, let me back up.

24          You seem to be under the belief that

00091

1  there was something on the gangway that shouldn't

2  have been there that caused your foot to slip.

3       Do I have that right?

4  A   Yes.

5  Q   Okay.

6       So what, if anything, did you say to

7  the captain to see to it that whatever it was that

8  you felt caused you to slip wouldn't do the same

9  thing to a passenger in the next few moments?

10  A   Just what I told him.  I told him I

11  twisted my knee on the gangway and that I would --

12  now had alerted him that there was something not

13  right.

14  Q   But you didn't tell him that you had

15  stumbled or slipped on something?

16  A   I don't recall the exact wording of it,

17  but I told him just what I -- what I've said.

18  Q   You did not tell him that there was

19  something, something of -- some foreign object on

20  the gangway, correct?

21  A   I told him I twisted my knee on the

22  gangway.

23  Q   Okay.

24       But you didn't tell him that you

00092

1   twisted your knee because of something that should

2   not have been on the gangway, in your view,

3   correct?

4       A   I don't recall saying anything specific

5   to that -- to that nature.

6       Q   Okay.

7           The maintenance and the cleanliness

8   of the GREY LADY was under your responsibility as

9   the chief mate, correct?

10      A   It was everyone's responsibility for the

11  cleanliness, but I had the overall responsibility

12  for it.

13      Q   Everyone else was answerable to you

14  except the captain, correct?

15      A   Correct.

16      Q   Similar to the situation you occupied on

17  the RED CLOUD and the BOB HOPE, correct?

18      A   Yes.

19      Q   Okay.

20          Did you express any concern or regret

21  to anybody that somehow you had not been able to

22  prevent something appearing on the gangway that

23  turned out to injure you?

24      A   Rephrase the question.

00093

1    Q    Well, let me put it another way.

2         Let's assume that some other crew

3    member had slipped on something on the gangway on

4    the ship.  As the principal safety officer, that's

5    something that you might feel concerned about

6    having happened, correct?

7         MR. ANDERSON:  I'm just going to

8    object, because I don't believe on this particular

9    vessel he was the principal safety officer.

10        MR. RAUWORTH:  Well, let me take that

11   phrase out of the question.

12   Q    Otherwise I've stated that correctly,

13   yes?

14   A    Restate the question without that.

15   Q    Sure.

16        I'll put it another way.  In general,

17   it was your job to see that there -- that the

18   vessel was kept up in such a way that there were

19   not foreign objects, improper objects, tripping

20   hazards around the decks of the vessel, correct?

21   A    Yes.

22   Q    And that is because of concerns of

23   everyone for the safety of the passengers as well

24   as the crew in going about their daily activities?

00094

1     A    That's true.

2     Q    Okay.

3           So if a -- if another member of your

4   crew had slipped on a foreign object on the

5   gangway, that's something that would in your job

6   capacity cause you to wonder if there was a

7   shortcoming of yours connected with that, correct?

8     A    I'll respond to that by saying that when

9   the -- when the gangway was initially deployed,

10   every effort is made to ensure a safe environment

11   for the passengers as well as the crew.

12           It's not to say that something might

13   not have been dropped from a passenger or from

14   within the luggage cart that ended up on the

15   gangway at the time that I had my accident.

16     Q    Okay.

17           Because as people and things pass

18   over the gangway, stuff can get dropped there,

19   right?

20     A    Yes.

21     Q    All right.

22           What -- what program did you employ

23   with your other subordinates on board to watch out

24   for things that might be dropped and pick them up

00095

1  before somebody could trip on them?

2     A   We always tried to look out for unsafe

3  conditions, but the environment on the vessel

4  within the company regarding that vessel was of a

5  hurried nature.

6            We were behind schedule.  We had --

7  both management and the master directed us to

8  hustle in our turnarounds to make up as much time

9  as we could.  And in that environment, that's what

10  we were doing, and that's why I was running up the

11  gangway, as well as my counterparts, to maximize --

12  to utilize as much time -- make the operation more

13  efficient and faster.

14            I shouldn't say efficient.  But that

15  night we were behind schedule.  Most of that day I

16  was on board we were behind schedule.  The previous

17  crew characterized they were behind schedule

18  because of how busy we were.

19            And it's because of that environment

20  that I was running and missed whatever was on the

21  gangway which caused the accident, as well as the

22  others that missed it as well.

23     Q   But no one knows what was on the gangway,

24  correct?

00096

1   A   I don't know what was on the gangway.

2   Q   Okay.

3      You're not aware of anyone who does?

4   A   I do [sic] not.

5   Q   You're not aware of anyone else who has

6  indicated any belief that there was anything

7  foreign or improper on the gangway, correct?

8   A   I do not know.

9   Q   Okay.

10      You didn't suggest to anyone that

11  they go and have a look at the gangway either to

12  find out what you believed you had slipped on or to

13  make sure that there was nothing there?

14   A   My discussion with the master immediately

15  following the accident was I felt sufficient at the

16  moment -- I was in excruciating pain and primarily

17  concerned about myself at that moment.

18   Q   Okay.

19      You didn't give any instructions to

20  any of the deckhands that worked for you to make

21  sure that the gangway was okay?

22   A   When I was on board inside the luggage

23  stowage area, I was sitting down and I might have

24  mentioned something to them to that effect, because

00097

1   they asked me what happened, and I said I twisted

2   my knee on the gangway.

3           They continued with the offloading of

4   luggage, reloading.

5       Q   What you actually told several people is

6   that your knee had just gone out, correct?

7       A   To that effect, yes.

8       Q   Okay.

9       A   Exact verbiage, I don't recall, but...

10      Q   Okay.

11          Not that you had slipped or tripped

12   on anything?

13      A   I don't recall the exact verbiage.

14      Q   Okay.

15          What were the sources of light

16   falling on the gangway?

17      A   Sources of light falling on the gangway?

18      Q   Well, you had made some reference to

19   feeling that the gangway didn't have enough light.

20          Did I hear that correctly?

21      A   Yes.

22      Q   Okay.

23      A   There was a light on board the vessel

24   that shone in the general direction of the gangway.

00098

1          There was some ambient light from the

2    pier, streetlights, so to speak.  At that time of

3    the night, it was late at night, so much of the

4    lights from businesses were turned out, so there

5    were a lot of shadowed areas on the pier, as well

6    as the gangway.

7      Q   Okay.

8          The departure from Nantucket on that

9    schedule was meant to be about what time in the

10   evening?

11     A   Approximately 2300, 2330.  11:00 p.m.,

12   11:30.

13     Q   Are you sure it was that late to leave

14   from Nantucket and still have an hour to go to get

15   back to Hyannis?

16     A   Best of my recollection.

17     Q   Okay.

18     A   I don't recall the exact time of it.

19     Q   Okay.

20          So the -- well, you had been on this

21   run and made a departure at this hour for the

22   better part of two months, correct, since late May?

23     A   Yes, for the better part.

24     Q   Okay.

00099

1          And you had never approached anyone

2    in the management or master of the vessel to report

3    to them that you felt that there was not enough

4    light on the gangway?

5        A    It was known there was some bad lighting

6    or not adequate lighting.  It could always be

7    better.

8        Q    Well, it's -- as you say, any situation

9    can always be better, correct?

10      A    Yes.

11      Q    But you felt as if the lighting was not

12   adequate, right?

13      A    In my opinion, yes.

14      Q    Okay.

15          And you never reported that to the

16   captain or to the management?

17      A    I recall having some discussions with the

18   captain that the lighting was inadequate over the

19   course of my time on board.

20      Q    What about with the management ashore?

21      A    I did not speak to management ashore

22   about that.

23          I took my concerns to the captain.

24   He, in turn, could choose to take it to management

00100

1  or not.

2     Q    Did you do anything yourself to try and

3  make arrangements for additional light on the

4  gangway?

5     A    Personally, no.

6     Q    Okay.

7          Did you do anything to provide

8  instructions to the other people who were working

9  with you regarding precautions they should take

10  when crossing any part of this gangway where you

11  thought the lighting was inadequate?

12     A    We would tell the passers to watch their

13  step, to use the handrails when boarding; and we --

14  there was discussions to, you know, make sure that

15  we try to do things as safely as possible and make

16  a safe environment for both us and the passengers.

17     Q    At the time that we're talking about

18  here, you held a license as master of steam and

19  motor vessels of any tonnage on any waters of the

20  world issued by the Coast Guard, correct?

21     A    Correct.

22     Q    That was a license that permitted you to

23  run the biggest -- to be captain of the biggest

24  vessels under the American flag, correct?

00101

1     A    Correct.

2     Q    That was a license that was of greater

3   capacity than the individual who was the master of

4   the GREY LADY II when you worked on it, correct?

5     A    Yes.

6     Q    The other people who worked there on the

7   GREY LADY had not had experience in running vessels

8   of the size or the complexity of the BOB HOPE or

9   the RED CLOUD, correct?

10    A    I can't speak of their specific

11   backgrounds, but based on discussions with them,

12   no.

13    Q    It was your understanding that their

14   careers had been in small coastal passenger

15   vessels?

16    A    Correct.

17    Q    Whereas you were a guy with blue water

18   experience?

19    A    Yes.

20    Q    And a considerable amount of it, correct?

21    A    Yes.

22    Q    The RED CLOUD and the BOB HOPE were

23   upwards of 800 feet long?

24    A    Nine hundred fifty feet long.

00102

1    Q    Okay.

2          And tonnage of roughly what gross

3    tons?

4    A    In excess of 60,000 tons.

5    Q    Okay.

6          And you had something in the order of

7    magnitude of 20 or more subordinates working for

8    you when you were chief mate on those ships?

9    A    Crews were typically numbered 20 to 30.

10    Q    Okay.

11          And the largest body of those would

12    be the deck crew who worked for you?

13    A    Yes.  The largest number of people were

14    within the deck department, largest single group.

15    Q    Right.

16          Had three watches that included the

17    at least one AB and one OS per watch?

18    A    Typically we had a bosun, five ABs and

19    perhaps two deck engine utilities.

20    Q    Okay.

21          Plus the two junior mates?

22    A    Yes.

23    Q    And was your responsibility in those

24    capacities to either take action with respect to

00103

1   conditions that represented safety hazards on those

2   MSC ships or else bring those conditions to the

3   attention of someone else who had the capability to

4   take care of them, correct?

5      A   Any current concerns I had we would take

6   care as best we could and brought to the attention

7   of the master.

8            As it related to the deck department

9   and the engineer, we'd do it for the engineering

10   department.

11      Q   Sure.

12           But if it was something that needed

13   attention that had a safety ramification on board

14   that was under the cognizance of the deck

15   department, if you couldn't take care of it with

16   your own resources, you would, for example, ask the

17   chief engineer for someone to weld something, or

18   you would put in a work order through the company

19   to get the situation attended to, correct?

20      A   That would be fair to say.

21      Q   Okay.

22           So you had plenty of experience being

23   a person who took responsibility to straighten out

24   safety concerns, correct?

00104

1          (Pause for court reporter.)

2     Q    We have to put that question to you

3     again.

4          MR. ANDERSON:  Just imagine he just

5     asked you.

6          MR. RAUWORTH:  I'm sorry, why don't

7     you read it back.  Mr. Trefny didn't understand

8     what went wrong here.

9          (Record read as requested.)

10    A    In my previous employment, yes, I did.

11    Q    Okay.

12         And as chief mate on the MSC ships,

13    if someone reported to you a condition that

14    appeared to you to represent a walking hazard,

15    let's take grease on the deck someplace for

16    example, you would take the appropriate steps to

17    fill that out, correct?

18    A    If I knew about it, yes.

19    Q    The question assumes someone reported it

20    to you.

21    A    If it was reported to me, I would have

22    taken care of it.

23    Q    Okay.

24         And things that you might not have

00105

1  had the capability on board to straighten out were

2  things that you were accustomed to calling for

3  help, whether it be from the engineering department

4  or someone ashore, correct?

5      A   If it was something myself or my people

6  could not take care of on our own, a simple

7  correction, then yes.

8      Q   Okay.

9          Sometimes you might do that through

10  internal company reports of a condition that needed

11  attention?

12     A   If there was a condition that had to be

13  reported, a condition that we could not fix

14  ourselves, but in all matters of safety of a ship,

15  all those matters were directed to the master and

16  the chief engineer.  If there was correspondence

17  required to go to the office regarding this, they

18  were the ones that handled it.

19     Q   You never had occasion to draft up a work

20  order to deal with a safety-related concern?

21     A   Generally, if it required modification or

22  repair of the ship's structure, the work order was

23  generally written by the chief engineer with input

24  from any number of people, from his department or

00106

1   myself or the other officers or captain.

2       Q    Okay.

3            But you were accustomed to following

4   up to make sure that work orders actually went in,

5   didn't get lost in the shuffle, et cetera?

6       A    Yes.

7       Q    Okay.

8            Did you ever go to anybody in the

9   management of Hyannis and say, you know, this

10  schedule is just too fast-paced, somebody is going

11  to get hurt this way?

12      A    I had many conversations with the captain

13  regarding that.

14      Q    Well, you answered a different question.

15  Let me ask you with regard to the people at the

16  management?

17      A    Understood.

18           MR. ANDERSON:  Can you define

19  management?

20      Q    Sure.  Shore management.

21      A    I don't recall making any statements to

22  shore management up to that time regarding any

23  concerns I had.

24      Q    You do not recall?

00107

1    A   I do not recall.

2    Q   Okay.

3         And the person you would have --

4    well, strike that.

5         You were hired by Murray Scudder?

6    A   Yes, I believe it was Murray Scudder.

7    Q   Okay.

8         And he assigned you to the crew that

9    had you on the --

10   A   Yes.

11   Q   -- GREY LADY II?

12   A   Yes.

13   Q   Okay.

14        (Pause.)

15   Q   What did you propose to -- strike that.

16   Let me back up.

17        What was the name of the individual

18   that you sailed with most of the time who was

19   master of the GREY LADY II?

20   A   Captain Bezedlo.

21   Q   Okay.

22        And did you make any proposals,

23   suggestions, recommendations to him regarding

24   safety as it related to that ramp in Nantucket or

00108

1   to the pace of things during the turnaround in

2   Nantucket?

3      A   Several occasions we had discussions

4   about the pace of operations and about the ramp

5   lighting, so he was aware of my concerns.

6      Q   What did you say to him ought to be done

7   or changed?

8      A   That we need to slow down.  We're rushing

9   around.

10           But both management and the captains

11  were creating an environment of the crews being

12  rushed to complete their tasks in order to maintain

13  the schedules as best as possible.

14     Q   And they told you you needed to rush even

15  though you felt it was unsafe?

16           Is that what the message was?

17     A   I was told on at least a couple of

18  occasions to hustle.

19     Q   Okay.

20           Putting that point aside for a

21  moment, let me get back to the question I was

22  trying to put to you.

23           Were you told to hustle without

24  regard to whether it was safe to do so?

00109

1    A   When I began employment as mate on that

2  boat, I was in a position of -- I acted in my own

3  accord as safety observer, make sure the passengers

4  were disembarking and embarking in a safe manner,

5  as well as the crew conducting themselves in a safe

6  manner.

7         I was told on at least a couple of

8  occasions by the captain and management that I was

9  not to do that, to take part in the loading and

10  offloading of luggage and to hustle when doing so.

11    Q   Wait a minute.

12         What was it that they told you not to

13  do?

14    A   I was acting -- I was --

15         Part of my job was taking tickets and

16  ensuring the proper boarding and disembarking of

17  the passengers and to oversee the loading of the

18  luggage by the deckhands.

19         I was -- it was at that time I was

20  told, no, you're going to be doing the luggage as

21  well, and when doing so, hustle.  So I spent a lot

22  of my time hustling around with the deckhands.

23         In the eyes of management and the

24  vessel captains, the mate was nothing more than a

00110

1    glorified deckhand.  The mate was not required to

2    be licensed or documented.

3        Q    Well, that's a decision of the Coast

4    Guard?

5        A    True.

6            MR. RAUWORTH:  Excuse me a second.

7            (Telephone interruption.)

8        Q    So this was a vessel that had a

9    certificate of inspection that called for one

10   individual to serve as master?

11       A    Yes.

12       Q    It required one license, basically?

13       A    As I recall, yes.

14       Q    Okay.

15           And that certificate of inspection

16   was posted on the vessel under glass where you or

17   anyone else could see it, correct?

18       A    It was posted in the wheelhouse.

19       Q    Under glass, correct?

20       A    Under some either glass or plexiglass.

21       Q    Okay.

22           So it was visible?

23       A    (Witness nods.)

24       Q    Similar to the way that your license goes

00111

1  into the rack on the RED CLOUD, correct?

2      A   Not similar.

3          MR. ANDERSON:  I don't think it

4  really matters what the --

5      A   The certificate of inspection was posted

6  within the wheelhouse, whereas the licenses were

7  not and are not -- the document was not posted for

8  everyone to see.  It was posted for those that were

9  in the wheelhouse.

10     Q   Okay.

11         It was quite accessible to you to

12 see?

13     A   Yes.

14     Q   Okay.

15         So basically, you took this job

16 knowing that this was a vessel that required only

17 one license?

18     A   I took the jobs that I took with Hy-Line

19 with the anticipation of becoming a vessel master

20 at some point, knowing I would have to work my way

21 up, hence the maintenance department, hence

22 deckhand, hence mate.

23         I did that.

24     Q   Okay.

00112

1            But you seem to be offenses by the

2    notion that the job title that they described as

3    mate had some of the same functions as a deckhand.

4        A    No, I -- I -- I don't believe I was

5    offended in that way.  I was --

6            No, I was not offended.

7        Q    All right.

8            Well, I'm sorry, I drew that

9    inference from your use of the word "glorified,"

10   which --

11       A    That's as it was characterized by the

12   master.  That was his words.

13       Q    Okay.

14            Well --

15       A    Not mine.

16       Q    Let me back up and get to what it was

17   that you were doing at the beginning that somebody

18   told you you ought not to be doing.

19            I thought I understood you to

20   describe that as taking tickets as people came

21   across the gangway.

22       A    That was one of my functions, as well as

23   overseeing the boarding of both passengers and

24   luggage and the subsequent disembarking.

00113

1    Q    So those things were your functions?

2    A    Those were my functions, but because I

3   was told --

4              I was required to take part of those

5   functions.  Therefore, I could not have an

6   overall -- I could not take an overall supervisory

7   position to ensure that there was a safe

8   environment for all personnel.

9    Q    And you didn't think that was right?

10    A    No, I did not think it was right.

11             But that was the way the company was

12   being run.  That's the way the boat was being run.

13   That the way I conducted myself.

14             I was learning the job every day.

15   And those vessels, due to their nature of business,

16   size, what have you, are run inherently different

17   than what I was used to.

18    Q    But in your own professional experience,

19   you felt that the way that they were doing these

20   things wasn't professionally correct?

21    A    I had opinions on how things were being

22   done.  They were my opinions.  It was a new

23   environment for me.  I had not worked in that type

24   of business before, so --

00114

1    Q    Why did you want to stay on?

2    A    I was looking at making a transition from

3  seagoing to shoreside type work.

4    Q    Why was that?

5    A    For personal reasons.  I chose -- I had

6  been going to sea for 14, 15 years, and I felt it

7  was time for a change.  I wanted to be closer to

8  home.

9         I took that job both for a little

10  extra money during my vacation time, but I was also

11  hoping to be taken on as a full-time employee.

12    Q    And that's why you didn't go back to the

13  RED CLOUD when the other chief mate rotated off,

14  correct?

15    A    I had communication with some individuals

16  within the company suggesting I would be back late

17  in the summer/early fall when I left the ship.  And

18  I may not have necessarily gone back to the RED

19  CLOUD.  There were other ships available with other

20  billets.

21         I took the -- as stated, I took the

22  job at Hy-Line both as a part-time job during my

23  vacation time, but if it turned out to be full-time

24  employment offered, I would have seriously

00115

1  considered staying on in that capacity and not gone

2  back to sea.

3        But as the summer was wearing on, it

4  looked like I was not going to have full-time

5  employment, so I would have gone back to my

6  seagoing job in the September time frame.

7    Q   Well, when you -- what's the name of the

8  guy who was the other chief man on the RED CLOUD,

9  the one who typically relieved you and whom you

10  relieved?

11    A   Alex Ryan.

12    Q   R-Y-A-N?

13    A   Yes.

14    Q   Okay.

15        Where is he from?

16    A   Washington State, I believe.

17    Q   Okay.

18        So he relieved you in early March of

19  2002?

20    A   Approximately, yes.

21    Q   Okay.

22        And so he -- he -- his -- your relief

23  of him would normally have come up in approximately

24  July of 2002?

00116

1          MR. ANDERSON:  If he relieved him.

2     A    If I relieved him.

3     Q    Okay.

4          So according to the pattern that you

5  had developed over the course of several tours with

6  Alex Ryan, you all had been baseballing that job,

7  correct?

8     A    Up to that time, yes.

9     Q    And baseballing means two people share a

10  job, in effect, correct?

11    A    I indicated I had conversations with some

12  folks in the office that I would be perhaps going

13  to another ship in another capacity.

14    Q    Well --

15    A    That I -- that I may not be going back to

16  the RED CLOUD.

17    Q    You had told people at Maersk that you

18  did not want to relieve Alex when he came off the

19  RED CLOUD?

20    A    There was some discussions about going to

21  another ship.  I --

22    Q    Initiated by whom?

23    A    I don't recall who initiated the

24  conversations, but it was possible that I was not

00117

1  going to go back to RED CLOUD.

2      Q    Was that your idea or Maersk's idea?

3      A    It was a combination of both.

4      Q    Who did you have the discussions with at

5  Maersk?

6      A    I can't recall his name.  I don't recall

7  the gentleman's name.

8      Q    Somebody in Norfolk?

9      A    Yes.

10      Q    Okay.

11          You didn't sail at all on your

12  license since you left the GREY LADY II, correct?

13      A    Correct.

14      Q    You have not taken any steps to get any

15  kind of seagoing work since you left the GREY LADY,

16  correct?

17      A    I've inquired about some shoreside work

18  but not seagoing work.

19      Q    Okay.

20          You renewed your license in early

21  2003?

22      A    Yes.

23      Q    You have all the appropriate STCW

24  endorsements?

00118

1    A    I do.

2    Q    You were -- you're legally qualified to

3    return to deep-sea work, correct?

4    A    Yes.

5    Q    Okay.

6         MR. ANDERSON:  Well, in three days.

7         MR. RAUWORTH:  Sorry?

8         MR. ANDERSON:  He's not legally

9    qualified at the moment because he's not -- he's on

10   active duty.

11        MR. RAUWORTH:  Okay.

12        We can split hairs about that, but in

13   three days, it won't matter.

14   BY MR. RAUWORTH:

15   Q    And you were legally qualified to go back

16   to seagoing employment all through 2003, correct?

17   A    Yes.

18   Q    Your license never lapsed?

19   A    No.

20   Q    And you, in fact, had to get a physical

21   in order to renew your license, correct?

22   A    Yes.

23   Q    Okay.

24        You've never registered with the AMO

00119

1  for work with anybody, Maersk or otherwise, since

2  you left the GREY LADY II?

3      A    Never registered, no.

4      Q    You were making preparations to spend a

5  few weeks of active duty with the Navy at the end

6  of the summer in 2002 and then return to Hy-Line,

7  correct?

8          MR. ANDERSON:  Can you repeat that

9  question?

10          MR. RAUWORTH:  Will you read it back.

11          (Record read as requested.)

12   A    That's possible, yes.

13          (Pause.)

14    Q    Is there anything that you know of that

15  stands in the way of your -- strike that.

16          Is there anything you know that stood

17  in the way of your going back to work for Maersk

18  during calendar year 2003?

19    A    Aside from me being on active duty, not

20  that I recall.

21    Q    But you weren't on active duty until the

22  last day of 2003, correct?

23    A    That's correct.

24    Q    There was no disciplinary or job

00120

1  performance issue at Maersk; is that correct?

2     A   Not on my part.  I -- there was -- I

3  was -- no.

4     Q   Did you have any reason to believe that

5  anybody was dissatisfied with your performance at

6  Mark?

7     A   No, I don't -- I don't have any knowledge

8  to that.

9     Q   You never heard anything to that effect?

10     A   Nothing was detailed in any of my

11  evaluations.

12     Q   Well, that's an answer to a different

13  question.

14          What I want to understand, is there

15  anything that in your own mind made you feel that

16  you were in any way less welcome at Maersk at any

17  point after you had gotten off the RED CLOUD in

18  March of 2002?

19     A   Not that I know of.

20     Q   Why didn't you go back to work at Maersk

21  after -- during or after January of 2003?

22     A   At the time, I was -- the Navy had --

23  despite being cleared for fit for duty by the

24  doctor, the Navy assigned me temporarily not

00121

1   physically qualified for duty, and I was making

2   efforts to be brought back on full duty.

3          But they were -- there was

4   documentation that kept me from being put back on

5   full duty, so I was working to change that status,

6   and I could not do that from a shipboard

7   environment.

8     Q   Well, let me understand this.

9          What you did to get back on to

10  active -- to remove the medical hold vis-a-vis

11  participating in the Navy was that you submitted a

12  letter in January of 2003, right?

13         MR. ANDERSON:  I'm going to object to

14  the medical hold.  He --

15         MR. RAUWORTH:  All right.  Let me

16  withdraw it.

17    Q   Whatever it was, the medical impediment

18  to your participation with the Navy, the way that

19  you went about removing that was by submitting a

20  letter to the chain of command in January of 2003,

21  correct?

22    A   That was one piece of it.

23    Q   Okay.

24          And within a few days of your

00122

1  submitting that, the Naval Reserve Center in Quincy

2  forwarded that on to the appropriate medical

3  officials within the Navy Reserve chain of command,

4  correct?

5      A   Yes.

6      Q   Okay.

7          And so that was a paperwork package

8  that included the opinions of the doctors that you

9  reckoned were going to be sufficient to put you

10  back to normal?

11      A   That's correct.

12          In addition, I had to -- I talked to

13  my doctor about submitting a letter.

14          I had to make myself available for a

15  possible in-person physical examination, all of

16  which I could not do from a shipboard platform.

17      Q   Okay.

18          Well, there was -- you would have

19  been perfectly free to take a four-month tour on

20  the RED CLOUD or some other Maersk ship and then

21  deal with sorting out the medical issues next time

22  you were back on shore on vacation, correct?

23      A   I could have, but I wanted to care of

24  this as soon as possible.

00123

1    Q    Because?

2    A    Because I -- it was characterized to me

3    that this type of injury was -- I was going to be

4    released from Naval service because of its

5    incompatibility with that type of service.

6         So I was working very hard to ensure

7    that I was put back into full duty.  And once that

8    happened, I felt that with operations as they were,

9    that I would be recalled at their earliest possible

10   convenience.

11   Q    At no time before the end of 2003 were

12   you under any orders for recall, correct?

13   A    No.

14   Q    Okay.

15   A    Except for December 31st was my first

16   indication.

17   Q    In other words, the end of 2003, correct?

18        MR. ANDERSON:  First order, not --

19   A    That was the mobilization orders.

20   Q    Right.

21   A    I was receiving temporary orders in July

22   '03 once I was cleared for duty and which I did go

23   to Kuwait to assist the team over there on a

24   temporary basis.

00124

1    Q    That was annual training, correct?

2    A    Yes.

3    Q    For a typical reserve AT, correct?

4    A    For my unit, yes.

5    Q    And for you?

6    A    Yes.

7    Q    Okay.

8         So that was not a mobilization?

9    A    It was not.

10   Q    And AT is subject to being scheduled with

11   inputs from the member and the various commands

12   involved, correct?

13   A    There was a scheduled cycle that the

14   command had for rotating people through.  And once

15   I received clearance for full duty, my unit and

16   myself made arrangements for my AT.

17   Q    Right.

18        And it was not obligatory that it

19   happened exactly when it did, correct?

20   A    No, I chose to do it as soon as possible,

21   as soon as possible after receiving a fit for duty

22   from the Navy.

23   Q    Between the time that you sent in the

24   letter in January of 2003 asking to be restored to

00125

1    full fit for duty status and the time that you

2    received word that you were, which was like in May

3    of 2003 --

4        A    As I recall, the official notification

5    was in June.

6        Q    Okay.

7             -- what did you do with respect to

8    the process of straightening out your medical

9    situation in the eyes of the Navy?

10       A    I was in communication with the medical

11   department representative at Quincy Reserve Center

12   to determine and follow the status of my request.

13       Q    On the phone?

14       A    Yes.

15       Q    Okay.

16       A    And in person as well.

17       Q    Well, you were -- let me back up.

18            When did you first become affiliated

19   with the Naval control of shipping -- I'm sorry,

20   the MSC reserve program?

21       A    I received orders to that unit in May of

22   2002.

23       Q    Okay.

24            And what was your -- what program

00126

1   were you affiliated with beforehand?

2       A    Prior to that, I was affiliated with the

3   Merchant Marine Individual Ready Reserve Group.

4       Q    Okay.

5            Why did you change?

6       A    I was approached by an officer that was

7   on my ship that was part of the Naval staff

8   embarked on board, and I was basically recruited.

9            MR. ANDERSON:  Do you mean a Naval

10  officer or a civilian?

11      A    Yes.  We had a Naval staff on board

12  that -- the commander of the maritime preposition

13  squadron.  We were the flagship.  The officer that

14  approached me was a member of the MSC Southern

15  Persian Gulf 101 unit in Quincy.

16           He suggested that I was a good person

17  to have and that they were looking for someone with

18  my background and experience to augment with the

19  unit.

20           After some communication, I received

21  orders to that unit.

22      Q    Okay.

23           Who was that individual?

24           (Pause.)

00127

1    A    I can't think of his name right now.

2    Q    What grade did he occupy or did he hold?

3    A    Lieutenant commander.

4    Q    Okay.

5        Now, in the status you occupied prior

6    to May of 2003 with the Navy Reserve, you did not

7    have an obligation to attend monthly drills,

8    correct?

9        MR. ANDERSON:  May of 2002.

10        MR. RAUWORTH:  What did I say?

11        MR. ANDERSON:  Three.

12        MR. RAUWORTH:  Sorry.

13    A    Prior to May 2002, my obligations to the

14    Navy is I did not have to attend monthly drills.

15    What those obligations were were to actively sail

16    with the merchant marine on my license, do two

17    weeks' annual training a year.

18    Q    Okay.

19        Now, when you shifted into the MSC

20    unit, that was a unit that had an obligation for

21    typically monthly IDT training, correct?

22    A    Monthly drills.

23    Q    Weekend drills?

24    A    Yes.

00128

1    Q    Okay.

2         So that -- it was different in that

3    regard from your status in the past?

4    A    Yes.

5    Q    Okay.

6         Now, did you discuss with anybody the

7    compatibility of working as a merchant marine

8    officer and maintaining the drill schedule?

9    A    I did.

10   Q    Who did you talk to?

11   A    The commanding officer.

12   Q    Okay.

13        And what was your conclusion about

14   their respective compatibility?

15   A    He stated that he would allow me to

16   remain with the unit, drill when I was on leave

17   status if I remained going to sea.

18        Upon return from a seagoing job, I

19   would make up the drills.  They were willing to

20   work around them because of my background,

21   experience and what the unit provided.

22        We with one other member that was in

23   the same situation.  He shipped out for a period of

24   time.  And when he was home, he drilled with the

00129

1   unit, did some extra work to make up for the lost

2   drills.

3       Q    Okay.

4              Go ahead.

5       A    It's called flex drilling.

6       Q    Mm-hmm.

7              And there was nothing that took place

8   during the period of January to June of 2003 that

9   couldn't have been handled in the same way,

10  correct?

11      A    What was different was I received

12  official written notification from the Navy stating

13  that I was temporarily not physically qualified for

14  duty and therefore could not drill, train,

15  mobilize, annual training whatsoever.

16      Q    Okay.

17             And you asked to have that changed in

18  January of 2003, correct?

19      A    Yes.

20      Q    And that was in the pipeline until

21  roughly June of 2003, correct?

22      A    Yes.

23      Q    Okay.

24             However, during that whole time, in

00130

1  the -- in terms of your status to work as a

2  merchant marine officer, you were fine, correct?

3      A    As of January '03, once I received fit

4  for duty from my doctor, I could have returned to a

5  seagoing position.

6      Q    You had had a physical to renew your

7  license, right?

8      A    Yes.

9      Q    Okay.

10          And your vacation time that had begun

11  in March of 2002 was long since past, correct?

12      A    Yes.

13      Q    So you were as eligible as you could be

14  to get a job sailing on your license as chief mate

15  or otherwise as of the beginning of 2003, correct?

16      A    I could have.

17      Q    Okay.

18          When you were on RED CLOUD out of

19  Diego Garcia, you had access to email, correct?

20      A    Yes.

21      Q    You had the ability to get ashore at

22  Diego Garcia, correct?

23      A    Yes.

24      Q    You could send a fax from there?

00131

1    A    Faxes were generally unreliable and not

2  used.

3    Q    There was no way you knew of to send a

4  fax?

5    A    As I said, they were unreliable.  It

6  could have been done, but not easily.  Most of the

7  transmission was done by satellite.

8    Q    Okay.


9         Even the shore facilities at Diego

10  Garcia were satellite-based?

11    A    To some degree, yes.

12    Q    There were no land lines?

13    A    I'm sure there were.

14        MR. ANDERSON:  That big population.

15    Q    Mail came in and out?

16    A    Yes.

17    Q    Okay.

18        They had courier services like FedEx

19  or DHL?

20    A    No.

21    Q    Okay.

22        You had access to telephones either

23  aboard the vessel or ashore at Diego Garcia,

24  correct?

00132

1     A   I did.

2     Q   Okay.

3          And you didn't -- there's nothing

4   physically that you did while you were ashore

5   during those months from January to June of 2003

6   that was necessary to cause your medical situation

7   to move through the pipeline, correct?

8     A   I made myself available in a concerted

9   effort to ensure as best to my ability that I be

10   retained in the Naval service, hence the phone

11   calls and the like.

12     Q   What was the situation that prompted you

13   to explore shifting from blue water work into work

14   of the kind that was presented by Hyannis Harbor

15   Tours?

16     A   It was purely personal in nature.

17     Q   Okay.

18     A   I was looking for a change.

19     Q   Okay.

20          You wanted to stay ashore?

21     A   I was exploring avenues to stay ashore;

22   but if nothing materialized, I would have gone back

23   to sea.

24     Q   And you didn't go back to sea after June

00133

1  of 2003, correct?

2     A   No, I did not.

3     Q   And you were fully eligible to do that?

4     A   Yes.

5     Q   You didn't want to go back to sea, right?

6     A   At the time I chose not to go back.

7        (Pause.)

8        MR. ANDERSON:  Do you want

9  authorizations for him to sign with respect to the

10  prior medication?  I don't have them.  If you want

11  him to sign them, do it now.

12        MR. RAUWORTH:  I do but there's a

13  change I need to make.  Well, let's sort that out.

14  BY MR. RAUWORTH:

15     Q   Are you expecting to be ashore in Cape

16  Cod for the foreseeable future?

17     A   Yes.

18     Q   Okay.

19        You've never been subject to any kind

20  of discipline within the military; is that right?

21     A   No.

22     Q   It's right or it's not right?

23     A   I have not been disciplined.

24     Q   Within the military?

00134

1    A    Within the military.

2    Q    Okay.

3         You've not been charged with anything

4    within the military; is that right?

5    A    I have not been charged.

6    Q    Okay.

7         Has there ever been any action taken

8    against your -- action taken or threatened against

9    your merchant marine license?

10   A    No.

11   Q    Have you ever been involved in any kind

12   of casualty in Naval or merchant marine service?

13   A    No.

14        MR. ANDERSON:  Have you ever been

15   charged with a crime?

16        MR. RAUWORTH:  I think he said that.

17   Q    You haven't been charged with a crime,

18   right?

19   A    I've not been charged with a crime.

20   Q    Right.  I thought I saw that in the ints.

21        MR. ANDERSON:  Have you had a prior

22   loss of -- I'm helping you out.

23   Q    Since Dave was so forthcoming, you've not

24   had a prior lawsuit?

00135

1      A    I've not had a prior lawsuit.

2      Q    You haven't paid any out-of-pocket

3   expenses with respect to any medical treatment

4   associated -- that you associate with the incident

5   on the GREY LADY, correct?

6      A    Correct.

7      Q    Okay.

8            Putting aside for the moment the

9   possibility of shipboard work, what's your belief

10  of what you would be most qualified to do by way of

11  occupation?

12           MR. ANDERSON:  Do you mean not

13  working on any ships at all, even in coastal and

14  mere coastal stuff?

15           MR. RAUWORTH:  We can get back to

16  that.

17           MR. ANDERSON:  All right.

18           MR. RAUWORTH:  Right now I'm talking

19  about -- well, let me back up and put it another

20  way.

21  BY MR. RAUWORTH:

22      Q    During 2003, as I understand it, the bulk

23  of your work was in security for Wackenhut,

24  correct?

00136

1    A    Yes.

2    Q    Okay.

3        Do you have any career aspirations

4    for shoreside work, apart from that line of work?

5        MR. ANDERSON:  Are you including,

6    when you say shoreside, are you including like this

7    Hy-Line Cruises or Provincetown Cruises or that

8    type of thing, which is sort of taking a boat out

9    for the today and coming back?

10        MR. RAUWORTH:  I'd like to

11    distinguish the two.

12        MR. ANDERSON:  Okay.

13        MR. RAUWORTH:  I'm talking about true

14    shoreside --

15        MR. ANDERSON:  True shoreside, all

16    right.

17    A    Relating to any shoreside work?

18    Q    Right.

19        I mean have you looked into or

20    thought about or identified some sort of a career

21    path that you have in mind to pursue --

22        MR. ANDERSON:  That is completely

23    unrelated to boats.

24    Q    Well, I didn't say completely unrelated,

00137

1  but that does not involve serving underway as an

2  officer.

3      A   I have.

4      Q   What's that?

5      A   I've looked into positions with shipping

6  companies in the area and the management and

7  operations side.

8          I've looked into positions of

9  construction at Mass. Maritime and recently I've

10  explored the thought of going back to school.

11     Q   In what sort of a program?

12     A   Some type of injuring discipline.

13     Q   Did you get a dual license from Mass.

14  Maritime?

15     A   I did not.

16     Q   Okay.

17          So you've got a deck license but not

18  an engineering license?

19     A   Yes.

20     Q   Okay.

21          Now, expanding the question to

22  include -- well, let me withdraw it.

23          Have you had any career aspirations

24  or investigations with respect to work that would

00138

1   include coastal aspirations of the kind that

2   include brown water, small passenger vessels for

3   the future?

4      A   I have not.

5      Q   Okay.

6            Have you made a decision that you

7   don't need to pursue that any further?

8      A   I have not made that decision.

9      Q   But your focus has been on more

10  shore-based work in terms of your looking into what

11  to do next?

12     A   Shore-based or limited coastal work.

13  I've not ruled out any options.

14     Q   Okay.


15           What's your current status with the

16  AMO?

17     A   I was dropped from membership from AMO

18  in, I recall, the winter of 2003 because of lack of

19  employment, meaning I did not go back to sea.

20     Q   Well --

21           MR. ANDERSON:  Dropped meaning just

22  you're not current with your -- you don't get

23  healthcare and stuff like that?

24           THE WITNESS:  I was not a full member

00139

1   of AMO at that point.  I was -- I had not paid into

2   my book fully at that time, and I received a letter

3   at some point last winter that I was dropped from

4   the membership.

5       Q    You weren't given the opportunity to pay

6   non-sailing dues?

7       A   I do not recall.

8       Q   Okay.

9            You have to be a member of AMO to

10  sail with Maersk, right?

11      A   Yes.

12      Q    And in order to do that, you would have

13  to reapply in a capacity described as applicant,

14  right?

15      A    Correct.  But let me clarify that.  I

16  applied directly to Maersk, and in doing so, that

17  employment was contingent on being a member,

18  becoming an applicant or a full name in AMO within

19  the union.

20      Q   Right.  Meaning you did not have to be a

21  member of the union prior to obtaining employment

22  with a particular company.

23           MR. ANDERSON:  You see, if he goes

24  back to Maersk, he'll become a member again.  It's

00140

1   not an impediment.

2           MR. RAUWORTH:  That's your opinion.

3   That's testimony, Dave, and I would appreciate your

4   not doing that.

5           MR. ANDERSON:  I know, but we're just

6   beating a dead dog.

7           MR. RAUWORTH:  No, we're not.

8           MR. ANDERSON:  There's nothing to it.

9           MR. RAUWORTH:  I beg to differ, and

10  it's my deposition.

11          MR. ANDERSON:  Okay.  Well, then just

12  ask him if what I said was true and he'll say, yes,

13  it's true.

14          MR. RAUWORTH:  That's -- you know,

15  it's coaching and it's not right.

16          MR. ANDERSON:  It's not coaching.  He

17  just said that.  All you --

18          MR. RAUWORTH:  No, that's your

19  interpretation of it, and I happen to know a fair

20  amount about this, and I would appreciate not

21  having your spin on it.

22          MR. ANDERSON:  Okay.

23              How is it different than what he

24  said?

00141

1          MR. RAUWORTH:  It's not for me to

2  have to explain to you.

3          MR. ANDERSON:  Then don't say that

4  you have all this experience at it.  He told you if

5  he gets a job at Maersk, he'll become AMO.

6          MR. RAUWORTH:  No, you said that.

7          MR. ANDERSON:  Okay.

8          Well, you tell me since you've got so

9  much experience at it.

10          What's the deal?

11          MR. RAUWORTH:  You have now just --

12          MR. ANDERSON:  Then ask him is that

13  the deal and he'll say yes or no.

14          MR. RAUWORTH:  It's not for me --

15          MR. ANDERSON:  Don't talk about all

16  your experience with AMO.

17          MR. RAUWORTH:  Don't interrupt the

18  examination.  If you have an objection, state an

19  objection.

20          MR. ANDERSON:  Keep going.  You're

21  beating a dead dog over and over.

22          MR. RAUWORTH:  Dave, you would be

23  subject to sanction if you did this in open court.

24          MR. ANDERSON:  If you did this in the

00142

1   courtroom, my God, the jury would be asleep.  They

2   would be yawning.  Just move it.  We've gone for an

3   hour over the silliest things.  Now --

4           MR. RAUWORTH:  They might be silly in

5   your mind, okay?  Just play by the rules and you

6   won't have a quarrel with me.

7           MR. ANDERSON:  Just --

8           MR. RAUWORTH:  It's "objection" or

9   nothing, Dave.  And next time, you know, I'm not --

10  I don't share your views, and I'm not required to

11  share your views, and I am entitled to take this

12  and make it an issue with the magistrate.

13          You don't interject yourself in an

14  examination.

15  BY MR. RAUWORTH:

16  Q   How does -- strike that.

17          Does Maersk have a seniority system?

18  A   I don't know.

19  Q   Okay.

20          Is it your belief that you would be

21  able to get -- strike that.

22          In terms of your own belief, what do

23  you think would happen if you called up Maersk

24  tomorrow and said you would like to go to work for

00143

1  them?

2          MR. ANDERSON:  I'm going to object

3  because it's totally irrelevant.

4          MR. RAUWORTH:  Your objection is

5  noted.

6          MR. ANDERSON:  Let me tell you why.

7          MR. RAUWORTH:  No.

8          MR. ANDERSON:  The wage loss claim

9  ends, it's over.  It's nothing.  It's a closed end

10  period of disability.  It is a hurt, okay, yes,

11  we're saying he missed some work from Maersk early.

12          MR. RAUWORTH:  Look, you are

13  completely -- look, I'm calling the judge.

14          MR. ANDERSON:  Go ahead.  Call the

15  judge right now.  Because this question --

16          MR. RAUWORTH:  You have no

17  business --

18          MR. ANDERSON:  This question is so

19  totally irrelevant.

20          MR. RAUWORTH:  It's my --

21          MR. ANDERSON:  What is the relevance

22  as to whether now, after he spent a whole year of

23  active duty with the Navy, whether he can get a job

24  at Maersk.

00144

1          We're not claiming he can't.  We're

2   not claiming he can.

3          We're saying the period of time in

4   which he's claiming any disability or any wage loss

5   is over.  He told you at the beginning of the depo

6   his knee feels great.

7          So what he does now or doesn't do now

8   has got nothing to do with any of the claims in the

9   case.

10          So we are not claiming he can't work

11   at Maersk now.  We're not claiming any wage loss

12   from this time period.  He just told you his knee's

13   wonderful, so I don't understand what possible

14   relevance this line of questioning has.

15          And if you can tell me, I'll let him

16   answer.

17          MR. RAUWORTH:  Your -- are you

18   instructing him not to answer?

19          MR. ANDERSON:  I'm --

20          MR. RAUWORTH:  Let me get that

21   instruction, yes or no.

22          MR. ANDERSON:  I'll instruct him --

23   I'll let him answer.  You can answer that question

24   but you're harassing him right now.  You're just

00145

1   going over and over this stuff ad nauseam.

2            MR. RAUWORTH:  Your conduct is --

3            MR. ANDERSON:  Just tell me what is

4   the possible relevance of this, whether he can work

5   today --

6            MR. RAUWORTH:  I'm not --

7            MR. ANDERSON:  -- at Maersk?  What is

8   the possible relevance to any claim or defense in

9   this case?  What's the possible relevance?

10           MR. RAUWORTH:  I do not have to

11  explain myself --

12           MR. ANDERSON:  Then I'm not going to

13  have him answer the question then.

14           MR. RAUWORTH:  You're instructing him

15  not to answer?

16           MR. ANDERSON:  I'm going to instruct

17  him --

18           MR. RAUWORTH:  I want grounds.

19           MR. ANDERSON:  Because it is not

20  relevant.  It is beyond the scope of Rule 26, it is

21  not relevant and it is not likely to lead to

22  relevant information based upon your question of

23  whether or not why he's not working for Maersk now

24  or not working for Maersk now, okay?

00146

1          You tell me one bit why it's

2    relevant, I'll have him answer, but it's not.

3    You're just asking these silly questions.

4          MR. RAUWORTH:  Are you asserting a

5    privilege, Dave, yes or no?

6          MR. ANDERSON:  You know what, go

7    ahead, answer the question and we'll be done with

8    this.  Go ahead.  I'll let him answer.  You'll be

9    happy, Mike, go ahead, have your question answered.

10    A    Please repeat the question.

11          MR. RAUWORTH:  Would you favor us

12    with that?

13          (Record read as requested.)

14          MR. ANDERSON:  Please note, it's just

15    a completely irrelevant question.

16    A    If I was to call them and request

17    employment once again, I don't know.  I can't

18    speculate on -- I can't speculate on what they

19    would say.

20    Q    I'm not asking you to speculate on what

21    they would say.  I'm asking you what is your

22    belief.

23    A    I don't know.

24    Q    Well, did you ever consider doing

00147

1  anything to prevent losing whatever status you had

2  with the AMO?

3      A   I didn't -- I did not have any

4  notification that that action was pending.  It

5  happened, and I was advised of it.

6      Q   When is the last time you had any

7  communication with Maersk?

8      A   As it related to my employment, I recall

9  speaking to them in the summer of 2002.

10     Q   And that's the most recent time?

11     A   Relating to my employment.

12     Q   Okay.  I guess I need to understand why

13  you're drawing a distinction.

14         Was there some other topic?

15     A   I had communication with some employees

16  of Maersk not associated with my employment but

17  those of matters dealing with MSC.

18     Q   Okay.

19         What was that about?

20     A   It was issues regarding ship operations

21  while I was serving as port operations officer and

22  had no connection --

23     Q   Oh, oh, oh, okay.

24         I think I understand it.  Let me try

00148

1  and say it in a quick way, and you can tell me if

2  I've got it right or wrong.

3          While you were serving with the Navy,

4  you encountered people from MSC that you were

5  acquainted with?

6      A   I encountered employees of Maersk and

7  talked with some folks in management of Maersk.

8      Q   But you did so in your capacity as a

9  serving Naval officer?

10     A   I did.

11     Q   Okay.  Now I understand.  I appreciate

12  it.

13          And that -- I didn't mean to cut you

14  off.  I think I got it, so that was to save time.

15          MR. RAUWORTH:  Let's mark this as an

16  exhibit, if we may.

17          (Exhibit No. 1 marked for

18  identification.)

19  BY MR. RAUWORTH:

20     Q   Okay.

21          We've marked as Exhibit 1 a copy of

22  the document that your lawyer handed me when we

23  came in, and just so you can see the exhibit number

24  on the front of that document, that's entitled

00149

1   Plaintiff's Answers to Defendant's Interrogatories.

2            While it's in front of you, let me

3   flip to page 10.

4            Is that your signature on the bottom

5   of that document?

6       A   Yes, it is.

7       Q   Okay.

8            You signed that today or yesterday?

9       A   Today.

10      Q   Okay.

11           You did that in Mr. Anderson's office

12  before you came over here?

13      A   I did.

14      Q   Okay.

15           And you had worked with him sometime

16  over -- sometime during the last week to arrive at

17  the answers that are included in here?

18      A   I did.

19      Q   All right.

20           And you went over the questions and

21  the answers and identified a few typos and

22  corrected those, correct?

23      A   Yes.

24      Q   All right.

00150

1             So, for example, on page 7 of

2    Exhibit 1, there's a couple of typos corrected here

3    with pen and ink, changes, those are your changes,

4    correct?

5        A    Yes.

6        Q    Okay.

7             MR. RAUWORTH:  Mark that as Exhibit

8    2.

9             (Exhibit No. 2 marked for

10   identification.)

11   BY MR. RAUWORTH:

12       Q    Exhibit 2 is a copy of a document that's

13   called Plaintiff's Response to Defendant's Requests

14   for Admission.

15            Why don't you take a look at that.

16            (Witness read document.)

17       A    Okay.

18       Q    Okay.

19            You provided to Mr. Anderson tax

20   returns and employment-earnings-related data?

21       A    Yes.

22       Q    Okay.

23            That included a Social Security

24   synopsis?

00151

1    A    Yes.

2    Q    And you provided to him copies of

3    correspondence with the Navy related to your

4    medical status?

5    A    Yes.

6    Q    Okay.

7         Provided to him copies of medical

8    records that you had following July of 2002?

9    A    Yes.

10   Q    Okay.

11        Were there any of the things -- any

12   of the copies that you provided to Mr. Anderson

13   that were altered or otherwise not genuine in terms

14   of being correct copies of the originals of those

15   documents?

16   A    I believe those copies are correct and

17   genuine.

18   Q    Okay.

19        And that was your intent in providing

20   them to Mr. Anderson, correct?

21   A    Yes.

22   Q    Okay.

23        MR. RAUWORTH:  Dave, to save time, I

24   would ask that you let me know what the basis for

00152

1  the denial is in --

2        MR. ANDERSON:  You're asking for a

3  request for admission that said they may be

4  admitted into evidence.

5        For example, you've produced your

6  insurance policy.  Now you're saying I should admit

7  that into evidence?  No, I don't think you want it

8  into evidence.  The insurance policy doesn't come

9  into evidence.

10        Whether it comes into evidence or

11  not --

12        MR. RAUWORTH:  Excuse me, you may

13  have misread.

14        I'm talking about the documents that

15  came from you guys.

16        MR. ANDERSON:  Doesn't matter.

17        Just because -- it doesn't mean they

18  go into evidence.  I'm not going to waive all my

19  objections to admissibility of evidence.

20  Absolutely not.  Just not going to do it.  1A says

21  you admit that every document you produce can be

22  admitted into evidence.

23        So, for example, if when he was 17

24  years old he's smoking dope and he gets a

00153

1  conviction, a juvenile conviction for smoking dope,

2  that doesn't come into evidence.

3        MR. RAUWORTH:  I guess I missed that

4  document.

5        MR. ANDERSON:  There isn't one.

6        But the point is this, I'm not going

7  to stipulate to the admissibility of all documents.

8        The appropriate -- if you have a

9  document which you want to get me to agree to its

10  authenticity, the appropriate way to do it is.

11  Either ask me or, B, go send a notice to the

12  request saying the attached the document is true

13  and accurate, so forth and so on.

14        But if you're asking for

15  admissibility into evidence I'm going to deny it on

16  every occasion, just about.

17        It's a different issue.  One is a

18  fact, the other is a legal conclusion as to its

19  admissibility.

20        MR. RAUWORTH:  Requests for

21  admissions are permitted to include legal

22  conclusions.

23        MR. ANDERSON:  Okay.  If that -- I'm

24  just not going to -- look, you can turn blue in the

00154

1   face.  I'm not going to agree to a blanket

2   admission of --

3           MR. RAUWORTH:  I'm simply asking.

4           MR. ANDERSON:  -- all these documents

5   in evidence.

6           I suspect that if you want his tax

7   returns, they're going to come into evidence.

8           I've given you everything I have.

9   I'm not holding back anything, but I'm not going to

10  agree that it all at maty goes into evidence.

11          MR. RAUWORTH:  I'm not trying to beat

12  you up.  I'm not trying to argue with you.

13          MR. ANDERSON:  You know what --

14          MR. RAUWORTH:  I'm trying to

15  understand simply what the basis was.  Now, you've

16  told me, whether it was right, wrong or

17  indifferent.  I just asked you what it was, so I

18  get you provided that.

19          MR. ANDERSON:  Does anybody agree to

20  that?  Have you ever had anyone say, sure, every

21  document, even that 17-year-old marijuana

22  conviction, that goes in, sure.


23          Has anyone ever agreed to that?

24          MR. RAUWORTH:  I guess I missed that

00155

1  marijuana conviction.

2         MR. ANDERSON:  You know?  It's like I

3  don't think anybody would ever admit to that.

4         Would you admit to it if I sent you

5  that same one?  Would you admit to it?

6         MR. RAUWORTH:  No, I'd tell you what

7  I'd do.  Those ones to which I had an objection, I

8  would point out in response to either the request

9  for admission or the interrogatories that called

10  for an explanation.

11         MR. ANDERSON:  But that's what you

12  have a pretrial for.  You put down your objections,

13  put your objections down --

14         MR. RAUWORTH:  You seem to believe

15  that you make the rules, and I have a problem with

16  that.

17         MR. ANDERSON:  Take it up with the

18  judge.  You want to bring this to the judge, take

19  it to the judge.

20         I don't have a problem with that one.

21         You can't even take that to the

22  judge.  I denied it.

23         (Discussion off the record.)

24  BY MR. RAUWORTH:

00156

1    Q    The period of duty that you contemplated,

2    Mr. Trefny, to take place in September of 2002 when

3    you were still working on the GREY LADY was a

4    period of annual training --

5             MR. ANDERSON:  Excuse me,

6    September 2002 he wasn't working on the GREY LADY.

7             MR. RAUWORTH:  Let me back up.

8    Q    When you were working on the GREY LADY,

9    you were contemplating a period of time of Naval

10   service for September of 2002?

11   A    I believe that to be correct.

12   Q    And you so informed Murray Scudder?

13   A    Yes.

14   Q    And the time that you expected to spend

15   in September of 2002 was time you were expecting to

16   spend on annual training?

17   A    I believe that to be true.

18   Q    Okay.

19           You don't know there was actually

20   something on the gangway of the GREY LADY that

21   night that caused your foot to slip, true?

22   A    I did not see anything.

23   Q    Okay.

24           So that's as far as your knowledge

00157

1   goes, correct?

2       A   Correct.

3       Q   Okay.

4           Between the incident in 1984 that you

5   mentioned to us, the flag football, and the surgery

6   in 1999 on your left knee have you had any -- any

7   times of admission to a hospital?

8       A   No.

9       Q   Okay.

10          Have you had to seek medical

11  treatment during that time, putting aside annual

12  physicals and things like that?

13      A   I don't believe so.

14      Q   Okay.

15          So no injuries or illnesses during

16  that time period which you can recall?

17      A   Best of my recollection, yes.

18      Q   Okay.

19          Your current affiliation is still

20  with the 101 unit down in Quincy?

21      A   Upon completion of active duty, yes.

22      Q   Okay.

23          Do you anticipate continuing in your

24  affiliation with that unit?

00158

1    A    For the foreseeable future.

2    Q    Okay.

3         The -- well, what's -- what is the

4    status of other folks in that unit as far as you

5    know?

6         Are there any people from that unit

7    that are currently mobilized on active duty?

8    A    I know of one.

9    Q    Someone who is overseas doing roughly

10   what you were doing?

11   A    Yes.

12   Q    Okay.

13        The orders that you got at the end of

14   2003 to start to work, in essence, full time with

15   the Navy, were those involuntary orders?

16   A    Yes, they were.

17   Q    Were you consulted at all about whether

18   you would prefer or not prefer to be included

19   with -- within the group of people who were so

20   ordered?

21   A    No.

22   Q    What -- what was your understanding in

23   the fall of 2002 with regard to the expected

24   mobilization of certain people in your unit in

00159

1  early 2003?

2        Is it your understanding that that

3  was going to be an involuntary mobilization?

4    A   Yes.

5    Q   And what was your understanding of the

6  criteria that was used to select the people who

7  would be subject to that mobilization?

8    A   I can't speak of the exact criteria.  It

9  was up to the commanding officer on who he was

10  choosing to be part of the --

11    Q   I'm not asking you to read his mind.  I'm

12  asking you about your own understanding about how

13  that selection was made?

14    A   I don't know how the selection was made.

15    Q   I'm not asking you --

16        MR. ANDERSON:  I don't understand

17  what is the point of what he thinks about what the

18  captain thought, whoever the commanding officer

19  was, about how that selection was made.

20        I can't see how that is remotely

21  relevant.

22        It's certainly not admissible.

23        MR. RAUWORTH:  It doesn't -- Dave,

24  you know --

00160

1          MR. ANDERSON:  He told you over and

2    over.  He doesn't know how his commanding officer

3    made that decision.  He doesn't know.  What more is

4    there to say?

5          MR. RAUWORTH:  I just want an answer

6    to the simple question as to what his understanding

7    was.

8          MR. ANDERSON:  He doesn't have one.

9    He doesn't know.

10          MR. RAUWORTH:  That's not what he

11    testified.

12          MR. ANDERSON:  Okay.

13          MR. RAUWORTH:  He said he didn't

14    know.

15          MR. ANDERSON:  You've asked him

16    twice.

17          MR. RAUWORTH:  No, and there's not

18    been an answer to the question, okay?

19          I'm not asking him what exactly the

20    criteria were.  I'm not exactly asking -- I'm not

21    asking him what the commanding officer thought.

22          I'm asking what you thought about

23    what the criteria were.

24          MR. ANDERSON:  What he thinks today

00161

1   about what the criteria were then --

2          MR. RAUWORTH:  For selecting those

3   people who were involuntarily -- to be

4   involuntarily --

5          MR. ANDERSON:  I'll give it to you,

6   it is just so irrelevant, but I'll give it to you.

7   Go ahead.  To the extent you even have a thought.

8     A   In order to receive -- strike that.

9          Are you -- are you asking for the

10  criteria from the commanding officer or Bureau of

11  Naval Personnel.

12    Q   I'm asking you what you believe were the

13  criteria used to select the people who would be

14  getting orders to be overseas in early 2003 from

15  your 101 unit.

16    A   It was not, to my understanding, up to

17  the commanding officer of that unit to specifically

18  spell out and issue orders to specific people.

19          As I understand the process to be, he

20  could make recommendations to Bureau of Personnel

21  on who is to be mobilized.

22          But that was contingent upon them

23  being qualified to -- for deployment.

24    Q   Qualified in the sense of having attained

00162

1  certain particular components of training, for

2  example?

3      A   That's part of it.

4      Q   Okay.

5          And -- well, I assume that in the --

6  in the early days of 2003, not everybody who was

7  qualified actually was mobilized from your unit?

8      A   Please repeat the question.

9      Q   In the early days of 2003, not everybody

10  from the 101 unit who was qualified actually got

11  mobilization orders to go overseas, correct?

12     A   Not everyone was mobilized.

13     Q   And not everyone who was qualified to

14  mobilize was mobilized, correct?

15     A   I can't speak to that.  I don't have that

16  information.

17     Q   Okay.

18          (Pause.)

19     Q   You were acquainted with people who were

20  eligible to be mobilized but that were not part of

21  the group that was sent to Kuwait, colleagues of

22  yours?

23     A   All of us in the unit, qualified or

24  not -- let me rephrase that.

00163

1          I do not know who was specifically

2    qualified or not qualified for deployment.

3      Q    Well, do you know anybody -- did anybody

4    that you know express disappointment in being not

5    included in the group that was going overseas?

6      A    I'm sure there were some.

7      Q    Well, the question is did you hear from

8    any of them?

9      A    Perhaps one or two.

10      Q    And forgive me if you've told me this

11    before, but the name of the current CO of that 101

12    unit?

13      A    I do not recall his name.

14      Q    Who's the -- what's the name of the most

15    senior person you know that's associated with that

16    person?

17      A    Most senior person is Commander Allie

18    Milligan.

19      Q    That's a female?

20      A    It's a male.

21          MR. ANDERSON:  Parents wanted to

22    toughen him up.

23      Q    A-L-L-I-E?

24      A    I believe so.

00164

1    Q    Milligan?

2    A    Yes.

3    Q    All right.

4         When is the last time you had any

5    communication with Commander Milligan?

6    A    Shortly after we returned to

7    Massachusetts from Kuwait.

8    Q    Okay.

9    A    Advising him I was here.

10   Q    That you would be coming back to drill?

11   A    That I successfully returned from Kuwait.

12   That I was in the middle of the demobilization

13   process and to advise him of that status.

14   Q    And, actually, the unit needs to provide

15   you with drill orders in advance of that weekend,

16   doesn't it?

17   A    I will receive some type of orders from

18   the Reserve Center on or about the 18th to resume

19   drilling with the unit.

20   Q    Okay.

21        What were you planning to use the

22   night vision goggles for that you bought at --

23   sometime in the second half of 2002?

24   A    I purchased those mainly for use on board

00165

1   a ship in my watch-standing capacity.

2       Q    Ships you were on didn't have them?

3       A    We did.

4       Q    Okay.

5               And what was it about the ones that

6   were on board that made you minded to spend 2,000

7   bucks on a pair for yourself?

8       A    No reason.

9       Q    Okay.

10              All right.  I think that's all I

11  have.

12              Do you have any questions,

13  Mr. Anderson?

14              MR. ANDERSON:  No, no.

15              (Proceedings adjourned at 2:49 p.m.)

16

17

18

19

20

21

22

23

24

00166

1          C E R T I F I C A T E

2

3          I, Jill K. Ruggieri, Registered

4    Merit Reporter and Certified Realtime Reporter, do

5    certify that the deposition of THOMAS W. TREFNY, in

6    the matter of Trefny v. Hyannis Harbor Tours, on

7    December 13, 2004, was stenographically recorded by

8    me; that the witness provided satisfactory evidence

9    of identification, as prescribed by Executive Order

10   455 (03-13) issued by the Governor of the

11   Commonwealth of Massachusetts, before being sworn

12   by me, a Notary Public in and for the Commonwealth

13   of Massachusetts; that the transcript produced by

14   me is a true record and accurate record of the

15   proceedings to the best of my ability; that I am

16   neither counsel for, related to, nor employed by

17   any of the parties to the above action; and further

18   that I am not a relative or employee of any

19   attorney or counsel employed by the parties

20   thereto, nor financially or otherwise interested in

21   the outcome of the action.

22                    _____

23   December 23, 2004    Jill K. Ruggieri, RMR/CRR

24

00167

1                    I N D E X

2

3  WITNESS:

4   THOMAS W. TREFNY

5     Examination by Mr. Rauworth       4

6

7                  E X H I B I T S

8

9  No. 1      Plaintiff's Answers to Defendant's

10           Interrogatories

11  No. 2      Plaintiff's Response to Defendant's

12           Requests for Admission

13

14

15

16

17

18

19

20

21

22

23

24

00168

1         THOMAS W. TREFNY

2      SIGNATURE PAGE/ERRATA SHEET

3

4 PAGE    LINE    CHANGE OR CORRECTION AND REASON

5 \_\_\_\_    \_\_\_\_    _____

6 \_\_\_\_    \_\_\_\_    _____

7 \_\_\_\_    \_\_\_\_    _____

8 \_\_\_\_    \_\_\_\_    _____

9 \_\_\_\_    \_\_\_\_    _____

10 \_\_\_\_    \_\_\_\_    _____

11 \_\_\_\_    \_\_\_\_    _____

12 \_\_\_\_    \_\_\_\_    _____

13 \_\_\_\_    \_\_\_\_    _____

14 I have read the transcript of my deposition taken

15 on December 13, 2004.  Except for any corrections

16 or changes noted above, I hereby subscribe to the

17 transcript as an accurate record of the statements

18 made by me.

19

20 Signed under the pains and penalties of perjury.

21 Deponent:_____ \_\_\_/\_\_\_/2004

22

23

24